P. H. MANTEL *vs.* CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

MINNEAPOLIS STREET RAILWAY COMPANY *vs.* SAME.

January 3, 1885.

Contributory Negligence—Railway—Collision with Street Car.—Evidence as to a collision between a train of cars and a street car at a crossing considered, and *held* to show contributory negligence on the part of the driver of the street car.

Negligence—Not a Question for Experts.—In such a case, whether certain acts were negligence, and whether due care required certain things to be done, are not matters for the opinions of experts.

Appeals by defendant in both the above actions from judgments of the district court for Hennepin county, where the two actions were tried together by *Koon*, J., and a jury.

*W. H. Norris*, for appellant.

*Wilson & Lawrence* and *Eli Torrance*, for respondents.

GILFILLAN, C. J. These are two actions, tried together in the court below, to recover for injuries caused by a collision at a street crossing of a street car belonging to the street railway company, driven by the plaintiff, Mantel, with a train of flat cars of defendant, by which Mantel, and the street car, and the horse drawing it were injured. The chief point here, as upon the trial below, relates to the alleged contributory negligence of the driver of the street car. The collision took place at the intersection of one of defendant's tracks with Cedar avenue, a street running north and south in the city of Minneapolis, along which and crossing the track ran one of the lines of the street-railway company. A train of 11 flat cars pushed by a locomotive was backing on defendant's track from the eastward, and had reached and was on the crossing of the two tracks when the street car coming from the north ran into it. Only one car ran on this street-car line, and it ran from some point north of defendant's line to a point on Cedar avenue a little over a block south, where it turned and went back, making 30 round trips, or crossing defendant's track 60 times

a day. Mantel was, and for three or four week prior to the collision had been, the only driver of this car, so that for three or four weeks he had been in the habit of making the crossing 60 times a day. He must be presumed to have been, and his testimony shows that he was, perfectly familiar with the situation, with the dangers of the crossing, and the necessity of exercising care in approaching and crossing. Nothing but an almost inconceivable neglect on his part could have left him ignorant of those things. For two or three weeks there had been, besides other trains, regular and irregular, two flat or gravel car trains running on defendant's track, the latter crossing Cedar avenue in all 14 times a day between 7 in the morning and 6 in the evening.

The track of defendant crosses the avenue, and then curves to the north, until, at the distance of about a quarter of a mile, it runs nearly parallel to it. It runs on an embankment from a point 550 feet north-easterly from the crossing, and on that part the track itself can be seen from various parts of the avenue. There are some sheds intervening in such a way that, at a point on the avenue 465 feet north of the crossing, the south line of Twenty-eighth street, the nearest point at which the track can be thus seen, is 880 feet from the crossing, and to one going north on the avenue the track can be seen nearer the crossing as he goes further north, till, at 1,200 feet north, the track can be seen at a point 558 feet from the crossing. From the latter point to the crossing defendant's track runs through a cut varying from 4 feet 7 inches to 5 feet 6 inches in depth, to a point 184 feet from the crossing, where it is 2 feet 8 inches in depth, and from there it lessens in depth to the crossing. South of Twenty-eighth street there are, between the avenue and defendant's track, buildings and fences somewhat obstructing the view until 40 feet from the crossing, so that it is evident one might pass south over that part of the avenue and not see a train of flat cars and locomotive on the track to the eastward, though he looked in that direction. Mantel testifies that he looked in that direction, but saw nothing. Within 40 feet north of the crossing nothing obstructs the view along the track to a point 184 feet east. At the latter point the cut was 2 feet 8 inches deep. The height of a flat car was shown to be from $3\frac{1}{2}$ to 4 feet, so that

at that point from 10 to 16 inches or more in height of the upper part of the flat cars would be visible to one looking eastward from any point on the avenue within 40 feet north from the crossing. The train in question was about 400 feet long. On the flat car nearest the crossing there was a man standing. From a point on the avenue 200 feet north to the crossing there is a fall of 2 feet 4 inches, of which 1 foot 6 inches is in the 100 feet nearest the crossing.

When driving towards the crossing Mantel stopped to let off some passengers, at a point about 265 feet to the north of it, and says that he then looked and listened, and, as he neither saw nor heard anything, he thought everything was clear, and started on. He drove his horse on a trot, with the brake half set, making, as he says, probably about four miles an hour, till he was about 25 or 30 feet from the crossing, at which point he was looking towards the west, and, immediately turning to look east, he heard a shout, and saw the train approaching. He says he at once applied the brake, but was unable to stop his car in time to avoid the collision. He testifies that the brake was in good order. There is no reason apparent, and no attempt was made to give any, for the inability to stop the car, except that its momentum, when it reached the point where the driver saw the approaching train, was such that it could not be stopped by the brake within the distance it had to go before reaching the crossing. He testifies that he could not tell within what distance a car could be stopped going down that grade, with the brake half set, at the rate of four miles an hour, but that when going at that rate on a level, with the brake in good order, it would probably take 15, 20, or 25 feet. This statement of facts is made solely from Mantel's testimony, and maps in evidence admitted to be correct.

A summary of the situation is this: While driving down the avenue from a point 265 feet to a point 40 feet from the crossing, Mantel, by reason of buildings and fences and the cut partially obstructing the view, and, perhaps, of some part of his attention being required in the opposite direction and in the care of his horse and car, could not be in any way sure that he would see a train of flat cars if coming, as this train was, within such distance as would make it necessary for him to stop his car before reaching the crossing; and

his hearing the train might be prevented by the direction of the wind or the noise made by his horse and car.

It was, therefore, not prudent for him to rely solely on the fact that upon looking he did not see any train, and upon listening he did not hear any. At 40 feet distance he could, by looking, make himself entirely sure that there was or was not a train coming dangerously near the crossing. If he had not looked at all within that distance, but had driven right on, no sane man would say that he acted with due care. And yet what good would looking within that distance do, if he had allowed his car to acquire such momentum that he could not stop it within that distance if he saw a train approaching too near? By permitting it to acquire that momentum and keep it till he was within 25 or 30 feet of the crossing, where, if we are to credit him with a proper endeavor to stop, he could not stop in time, he rendered looking practically useless as a means to secure his safety. That it was a grossly imprudent way to approach so dangerous a thing as a railroad crossing, over which trains frequently pass, is too clear to admit of any reasonable question. No one fairly, reasonably, and understandingly exercising his judgment could come to any other conclusion.

As this renders a new trial necessary, we need not consider the other points in the case, which may not arise on the second trial, except, perhaps, the rulings of the court below upon certain parts of the depositions offered. As to those, we will say that whether this or that act of plaintiff or defendant was negligence, and whether due care required this or that to be done, are not matters for expert testimony. They are not matters of science or skill, as might be such a question as how long it would take to stop a train of cars or a street car going at a designated rate of speed, but they are matters of judgment and common experience, to be determined, upon the facts and circumstances of the case, by the jury, who are as competent to determine them as any witness can be.

Judgments reversed, and new trial ordered.