KATHERINA SNEDA, Administratrix, v. ALBERT LIBERA and Another.[1]

MICHAEL KULAS v. SAME.

June 29, 1896.

Nos. 9976, 9977—(145, 159).

**Master and Servant—Action for Injuries—Negligence—Assumption of Risk—Province of Jury.**

In actions based on the alleged negligence of a master towards his servants, arising out of the same accident, tried separately below, but on appeal argued and submitted together, it is *held*, on the evidence, that the question of the master's negligence was for the jury, and also the question of the assumption of risk by the servants, and also whether a certain act said to have been performed by one of the servants in and about the work rendered him guilty of contributory negligence which would prevent a recovery in either or both of the cases.

**Expert Testimony—Opinion of Witness.**

The general rule laid down in respect to the admission of expert opinion evidence is that the opinions of witnesses possessing peculiar skill are admissible whenever the subject-matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance.

**Same—Sufficiency of Wall.**

*Held*, under this rule, that, in an action growing out of the collapse of a cistern wall while being constructed, the opinions of qualified experts might be received in evidence as to the sufficiency of the wall in respect to thick-

[1] Reported in 68 N. W. 36.

65 M.—22

ness alone, and whether a wall of the thickness of the one in question was strong enough to resist the pressure naturally resting upon it.

**Same—Discretion of Court.**

The preliminary question whether a witness offered as an expert has the necessary qualifications is for the court, and is largely within its discretion.

Appeals from the district court for Winona county, Gould, J.

In the first action plaintiff appealed from an order denying a motion for a new trial. Reversed.

*Brown & Abbott,* for appellant.

*P. J. McLaughlin* and *Samuel Morrison,* for respondents.

In the second action defendants appealed from an order denying a motion for a new trial after a verdict in favor of plaintiff for $3500. Affirmed.

*P. J. McLaughlin* and *Samuel Morrison* for appellants.

*Brown & Abbott,* for respondent.

COLLINS, J. These actions, growing out of the same accident, were tried separately, but on appeal were argued and submitted together, and can be considered and disposed of in the same way. The one in which Mrs. Sneda, as administratrix, is plaintiff, was brought to recover damages for the death of her husband, caused, as she claims, by defendants' negligence when constructing a cistern wherein the deceased was employed by them as a brick mason, while that in which Kulas is plaintiff was brought to recover for injuries received by him at the same time, while he was working for defendants as a common laborer. At the conclusion of the trial of the Sneda case the court directed a verdict for the defendants, and she appeals from an order denying her motion for a new trial. Kulas had a verdict in his favor, and defendants appeal from the refusal of the court to grant them a new trial.

It is necessary that a very full statement of the facts be given. Defendants were contractors and builders, and in 1894 entered into a contract with the owners to do certain specified work in and about the convent buildings in the city of Winona. They were also to do such other or extra work as might be ordered by the superintending architect of the owners, who were to furnish all materials. As extra

work, they were ordered to build a 600-barrel cistern in a designated place, about eight feet distant from one of the buildings. The building was of brick and stone, two stories high, and surmounted by a tower an additional story in height. The subsoil here was sand and gravel, and very easily set in motion by its own weight. The cistern was to be built in accordance with plans prepared by the architect, and these plans required it to be 16 feet in diameter, 18 feet deep, and inclosed in a circular wall eight inches wide, made of brick and cement.

The defendants first caused the earth to be removed where the cistern was to be constructed, leaving the sides of the excavation thus made, sloping so as to be self-sustaining, and to the depth of eight or nine feet. In the center and on the bottom of this excavation, defendants built a circular wooden ring, about 16 feet in diameter, eight inches thick at the top, eight inches deep, and brought to an edge at the bottom, perpendicular on the outside, and caused an eight-inch circular brick wall to be laid on the top of this ring, flush with the outside thereof, thus starting the brick and cement wall of the proposed cistern. After building this circular wall up to a height of several feet, defendants caused the earth to be filled in on the outside of it. The building of this wall was continued until it was 14 inches above the surface of the ground, the plan being to cause the ring to settle and cut its way down as the excavation deepened. When the cistern and wall had been thus sunk to a depth of about 12 feet, the top of the wall having been kept about 16 inches above the surface of the ground, the excavation became more difficult, and could not be carried on so as to cause the ring and wall to settle as fast as the masons were laying the brick, and it became necessary for the masons to wait for the excavation. For this reason, about two days before the accident, defendants laid off the two brick masons (the deceased and one Stanek), and proceeded personally, in the absence of the masons, to excavate the cistern and sink the wall in the manner described.

At the time the masons left the work the cistern wall was moving downward as the excavation proceeded, in the proper manner; but after they had gone, and defendants had proceeded with the sinking of the cistern and wall about 16 inches, the whole wall "hung," and refused to settle any further, supposedly on account of the lateral pressure of the earth around and upon the outside. The defend-

ants then caused the dirt to be removed from the center of the cistern to the depth of two feet below the bottom of the ring, whereupon a horizontal crack appeared, running around the cistern about two feet above the bottom of the wall. The part of the wall below this crack dropped down and away from the upper part about two inches, leaving the upper part of the wall still hanging. The defendants then caused the earth around the outer side of the upper portion of the wall to be removed to the depth of about four or five feet, placed timbers across the top of the cistern wall, and piled a large quantity of brick upon the timbers, for the purpose of weighing down and sinking the wall, and thus forced the upper part down so that it joined the part which had fallen away. About the time the bricks were placed on the timbers across the top of the wall, several perpendicular cracks or breaks appeared, running from the top of the cistern down for several feet. Defendants then caused five holes to be punched down, close to and outside of the wall, to its full depth, and passed five ropes down through these holes, outside of the wall, under the bottom of the ring, into the cistern, thence up to the top, and joined the ends, forming five perpendicular loops or bonds about the wall. They then placed in each of these loops a stick or lever, whereby they were twisted tight so as to hold the lower portion of the wall to the upper. The dirt which had been dug away from outside of the wall was then replaced. On the side of the wall towards the building the bricks were loosened, and defendants caused a plank a foot wide and several feet long to be placed over these loose bricks, and another plank to be placed perpendicularly against the opposite side of the wall, and placed two braces, 16 feet in length, composed of 2x6 pine planks, across the cistern, nearly parallel, with the ends nailed to these perpendicular planks. In placing these braces in position, they were forced and driven in between the upright planks so tightly that they were caused to bend in the middle, at which point such braces were spiked together. After a short time the shape of the cistern wall so changed that these braces became straight. Defendants, in their efforts to sink the wall, dug out more or less sand from underneath it, which was not replaced. Defendants then caused a carpenter to build another circular wooden ring inside the first one, but similar, so that the top of the new came up to the bottom of the one first put in.

When this was completed, and the wall was in this condition, defendants sent word to the bricklayers (deceased and Stanek) to come and resume work, and, upon their return, ordered them to build an eight-inch brick wall upon this inside ring until it was built up to the horizontal crack in the outer wall, and then to remove the dirt from the center of the cistern, and build up on the top thereof as fast as the dirt should be removed and the inside wall should settle, keeping the top of this inside wall about even with the crack in the outside. This the masons proceeded to do, Kulas assisting as a common laborer. When the inside wall had been settled to the depth to which the cistern was to be built, the masons removed the cross braces or planks, and proceeded to reduce the inside wall to four inches, and to build it upward. It was claimed by plaintiffs that defendant Libera instructed the masons to remove the braces, and the evidence on this point was conflicting, Libera testifying that he gave no such order. Soon after their removal, Kulas being at work in the cistern with the masons, the loose bricks before mentioned commenced to fall to the bottom of the cistern; considerable sand poured in; and the wall collapsed, or gave way, burying all three. Both masons were killed, and Kulas was seriously injured.

The only information either of the masons had as to what had been done while they were absent was such as they could have gathered from the appearance of the wall, so far as appeared on the trial. It also appeared that the duties of the architect were supervisory. He furnished the plans, and, as the representative of the owners of the premises, ordered defendants to do this particular job of work under the extra clause in their contract. He also made frequent visits to the work, as might be expected, and at times advised with defendants and the workmen. But the latter were employed by, and were wholly under the control of, the defendants,—responsible to them alone, and not in any manner to the owners. Although in the Kulas case the court submitted to the jury the question whether or not the workmen were servants of the defendants, or of the owners of the premises, there was, on the evidence, no such question in the case. Undoubtedly, the relation of master and servant existed between defendants and the workmen.

In the Kulas case the court submitted to the jury the question of defendants' negligence. This was correct, for the general duty of a

master is to exercise care to prevent the exposure of his servant to unnecessary and unreasonable risks.    He is required, among other things, to use reasonable diligence in seeing that the place where the service is to be performed is safe for the purpose; and this duty extends, not only to such unnecessary and unreasonable risks as are in fact known to him, but also to such as he ought to have known in the exercise of diligence proportionate to the occasion, and this duty is continuous.    Nor can the master avoid his duty, or the liability which arises therefrom, by saying that he acted, when adopting his plans, upon the advice of an architect whom he believed to be competent.    On the facts as they appeared upon the trial of each of these cases, there was an abundance of evidence on which to submit the question of the master's negligence to the jury, both as to the plan adopted, and the manner of doing the work.    This clearly appears from our statement of the facts, many of which were not in dispute.    The evidence tended to show that taking into consideration the character of the soil, the size of the cistern, and the fact that it was being constructed within a few feet of a heavy brick building, the weight of which would exert more or less pressure on one side of the wall, the latter was scarcely half thick enough for the purpose.    And it also tended to show that the methods pursued by defendants after the cracks and the loose brick appeared—the latter on the side nearest the building—were hazardous, and invited the disaster.    A jury would certainly have been justified in finding that the defendants did not take sufficient precautions when they discovered that the wall gave indications of a tendency to fall apart.

What has been said in regard to the question of negligence on the part of defendants applies to both cases; for, on the facts, no sufficient distinction can be pointed out, arising either from the testimony, or from the fact that Sneda was a skilled brick mason, while Kulas was a common laborer.    On this question the Sneda case should have been submitted to the jury; for it is only when there is an entire absence of testimony tending to establish a master's negligence that a court can order a nonsuit.

It is also urged by defendants' counsel that all of the workmen assumed the risk, and therefore no recovery can be had in either case. A servant assumes the ordinary risks of his employment,—such as are reasonably necessary and incidental to it, including negligence of

fellow servants; and, as a general rule, he also assumes such extraordinary risks as he may knowingly and voluntarily see fit to encounter.   But he does not stand on the same footing as his master, as respects the matter of care in inspecting and investigating the risks to which he may be exposed.   If he did, the servant would always assume the risks.   He has a right to assume that the master will do his duty in respect to risks, although this proposition is subject to the qualification that the servant must not rashly or deliberately expose himself to unnecessary and unreasonable risks.   And it is one thing to be aware of defects in plans or methods, and another thing to know or appreciate the risks resulting, or which may follow, from such defect.   The mere fact that a servant has knowledge of defects in plans or methods of construction may not charge him with contributory negligence, or assumption of risk.   The question is, did he know, or ought he to have known in the exercise of ordinary common sense and prudence, that, in addition to the defects, the risks existed?   And upon the evidence this question of assumption of risk was for the jury in both cases.

In the Sneda case it is urged that his administratrix cannot recover, because he removed the braces, and was therefore guilty of contributory negligence.   In the first place, the jury might have found from the evidence that they were removed by express direction of one of the defendants; and, second, the court could not say, as a matter of law, that this removal caused the wall to collapse.   The cause of the accident was an open question, and for the jury to determine.   It is also claimed that as Sneda and Kulas were fellow servants, and the accident was caused by the removal of the braces by the former, the latter cannot recover.   We have already answered this contention.   It follows from what has been said that the trial court erred when it directed a verdict for defendants in the Sneda case, and that a new trial must be had.

We now reach a consideration of certain rulings made by the court when receiving testimony in the Kulas case.   The questions to which defendants' counsel made objections were all of the same general character, and called for opinions from the witnesses as to the sufficiency of the wall in respect to thickness alone,—it being admitted that the materials used were of excellent quality, and well put together,—and whether, considering the undisputed facts, a wall

eight inches thick was strong enough to resist the pressure naturally resting upon it. The objections made by counsel to this class of testimony were that it was incompetent and inadmissible, and, in some instances, that the qualifications of the witnesses to express expert opinions had not been shown.

The preliminary question whether a witness offered as an expert has the necessary qualification is for the court, and is largely within its discretion. And in some states it is held that under no circumstances will the exercise of this discretion be reviewed. 1 Greenleaf, Ev. (15th Ed.) § 440, and note c. All of the witnesses were shown to be, to some extent, qualified to express opinions on the subject concerning which they were questioned, and were clearly brought within the rule first above stated, which we regard as the proper one.

The general rule laid down in respect to the admission of expert opinion evidence is that the opinions of witnesses possessing peculiar skill are admissible whenever the subject-matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance. On questions of science, skill, and trade, or others of the like kind, persons of skill may not only testify to facts, but are also permitted to give their opinions in evidence. 1 Greenleaf, Ev. § 440, note 4. See, also, Sowers v. Dukes, 8 Minn. 6 (23). As cases bearing upon the admissibility of expert testimony with respect to the strength and sufficiency of the cistern wall, we cite Claxton's Admr. v. Lexington & B. S. R. Co., 13 Bush (Ky.) 636; King v. New York C. & H. R. R. Co., 72 N. Y. 607; Evarts v. Town of Middlebury, 53 Vt. 626; Bemis v. Central Vt. R. Co., 58 Vt. 636, 3 Atl. 531; Pope v. Filley, 9 Fed. 65. The witnesses had superior skill and knowledge as to the resisting powers of a brick wall imbedded in sand in close proximity to great weight, and of what thickness it should be to sustain the pressure. Inexperienced men, such as ordinary jurors, were not likely to prove capable of forming a correct judgment upon such a subject without assistance from the skillful and experienced. There was no error in the rulings challenged by the last seven specifications of error.

The order refusing a new trial in the Sneda case is reversed, and a like order in the Kulas case stands affirmed.