## CORA E. PALMER AND ANOTHER v. ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA.[1]

March 16, 1934.

No. 29,594.

[1]Reported in 253 N. W. 543.

See 187 Minn. 272, 245 N. W. 146.

*Meighen, Knudson & Sturtz* and *Raymond N. Klass,* for appellants.

*H. L. & J. W. Schmitt, Charlotte Farrish, Alfred T. Vollum, Elmer R. Peterson,* and *E. W. Dillon,* for respondent.

*HOLT, Justice.*

Plaintiffs appeal from the order denying their motion for a new trial.

A sufficient statement of the case is made in a former appeal, reported in 187 Minn. 272, 245 N. W. 146, where the judgment was reversed and a new trial granted. The new trial resulted in a verdict for defendant. The action is to recover on an accident insurance contract issued to Arthur E. Palmer, payable to plaintiff Cora E. Palmer, his wife. The insured was found dead in his garage on October 24, 1930. The engine of his car on which he had been working was running. One of the defenses alleged was that the insured died from monoxide poisoning, not covered by the contract.

The errors assigned are: (a) Permitting the coroner to give an opinion as to the cause of death; (b) allowing defendant to ask its experts improper hypothetical questions; (c) erroneously construing the contract not to cover accidental death from carbon monoxide; (d) refusal to give certain requested instructions. One ground for a new trial was insufficiency of the evidence to sustain the verdict, but no assignment of error covers that ground on the appeal, and obviously no such ground could be urged with any hope of success.

The assignment of error deemed most serious is permitting the coroner to give his opinion as to the cause of death. What caused the death of the insured was for the jury. If the jury could be aided in determining that issue by the testimony and opinion of experts such testimony was admissible. A physician is generally conceded to be a qualified expert witness as to the cause of death, even though without experience. 3 Jones, Evidence (2 ed.) § 1314, suggests this guide, formulated in Olgiati v. New England Box Co. 80 N. H. 399, 403, 117 A. 735, 738:

"The test to determine whether a witness is qualified as an expert is to inquire whether his knowledge of the matter in relation to which his opinion is asked is such that it will probably aid the trier of the question to determine the truth."

Section 1315 deals with the different modes of acquiring such knowledge as from experience, from study, and from both. It is for the trial court to determine whether a witness qualifies as an expert. 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 3335. Wigmore in his work on evidence sums up his conclusions on the qualifications of expert witnesses in § 561 by this suggestion of what the rule for the future ought to be, viz:

"The experiential qualifications of a particular witness are invariably determined by the trial judge, and will not be reviewed on appeal."

It is not necessary now to adopt the rule suggested by the eminent author. The witness here was not a doctor. He was the coroner and an undertaker. To carry on the business of undertaker he had taken the regular three-months prescribed course at the University of Minnesota, and 60 hours of that course were devoted to the study of death causes. His instructor had been a physician of the regular staff of the university, from whom he had received instruction relative to symptoms of carbon monoxide deaths. The witness had pursued the business of undertaker since he received his diploma in 1922, the last four years for himself. As such he had taken care of and prepared for burial some 600 bodies, among them being cases of skull fractures and one, Victor Turbert, whose death was caused by carbon monoxide, according to the testimony of one of plaintiffs' experts. As coroner he examined minutely the bodies of those who had died a sudden or violent death. Mrs. Palmer had caused him to be called to care for Palmer's body before the doctor was called. The witness testified as to the observations he made of the body and surrounding conditions. He carried it to his place of business, undressed it, examined it closely, and embalmed it within two hours. In so doing he paid particular attention to the color of the surface tissue, to the color of the blood, and noticed that it did not coagu-

late. It seems to us the witness qualified so as to be able to aid the jury as to the cause of death. But even if he be held not qualified, allowing him to give his opinion that Palmer's death was caused by carbon monoxide did not harm plaintiffs. It clearly appears that his opinion was based upon the color of the outer tissue of the corpse. All the medical experts agree that the pinkish or cherry-red color of such tissue is indicative of death by carbon monoxide. True, they also claim that the same color appears where death is from rare cases of pneumonia or from nitrates taken internally. But these causes were eliminated by the testimony of plaintiffs that Palmer was in perfect health when he went to the garage a short time before he was there found dead. There was no suggestion of suicide by nitrates, and the court charged that there was no evidence of suicide. So if the pinkish color testified to by the coroner was present similar to that present in the body of Victor Turbert, all the medical experts agree that death from carbon monoxide was indicated, and the opinion given by the witness added nothing to the force of the evidence.

The cases chiefly relied on for a reversal because of the admission of the coroner's opinion are: Anderson v. State, 19 Ala. App. 606, 99 So. 778, where all the medical experts testified that the person whom the defendant was charged with murdering died from natural causes, and the jury predicated the verdict of guilty solely on the opinion of the undertaker that the person was murdered. The decision does not disclose any attempted qualification of the witness as an expert, either from study or experience, or even of any knowledge gained from examination of the body or otherwise. The case is not helpful here. The same may be said of New York L. Ins. Co. v. Rogers, 156 Md. 88, 143 A. 651, 653, where the court refused to receive the opinion of the undertaker as to the probable length of time the body of the insured had been in the water of the harbor. If anything, this statement of the court inferentially justified the ruling in the instant case [156 Md. 93]:

"There was no proof as to his qualifications to express an admissible opinion upon the subject of the inquiry. His experience in

the undertaking business, and his membership in the state board of undertakers, may not have involved any observation of the effects of water, under various conditions, upon the bodies of drowned persons, as indicating the approximate time of death."

A like case is Reeves v. State, 95 Tex. Cr. R. 28, 252 S. W. 781, where an undertaker, not having shown himself an expert upon the subject, was improperly permitted to give the opinion that the deceased after being shot several times would have strength enough to walk a certain distance; the court, however, held the error not prejudicial. Other cases cited appear to us not in point.

We see nothing wrong in the hypothetical question asked Dr. Hayhurst which requires a new trial. His testimony was by deposition. It is perhaps not possible to frame such questions in the best form prior to trial. This doctor appeared an outstanding expert in respect to gas poisoning, and by a very complete cross-examination plaintiffs brought out all possible facts and assumptions which from their standpoint could challenge the opinions given by Dr. Hayhurst.

The defendant is a fraternal beneficiary order or association of Ohio licensed to do business in this state. In 1919 Arthur E. Palmer became a member and received a certificate insuring him "against death as the result of external, violent and accidental means, independently and exclusively of all other causes, in the sum of $6,300." The certificate, as well as the constitution and by-laws of the order, constituting the insurance contract, contain almost two pages specifying certain causes of death not covered by the contract. Among those not covered are suicide, the intentional taking of drugs, "inhaling of gas or asphyxiation (voluntarily or involuntarily, conscious or unconscious)." The quoted exception was in the constitution at the time Palmer became a member. At the time of Palmer's death the constitution had been amended so as to read: "inhaling of manufactured or natural gas, carbon monoxide poisoning, hydrogen or any other form of gas causing asphyxiation (voluntary or involuntary, conscious or unconscious)." The court refused to instruct the jury that the insurance contract did not exclude from benefits if death was caused by carbon monoxide. This is assigned

as error. The court did charge the jury that if carbon monoxide gas caused Palmer to fall plaintiffs could not recover; but "if independent of gas poisoning decedent slipped, as claimed, struck his head, became unconscious and died, even though while so unconscious he inhaled poisonous gas, the proximate cause of death was his accidental injury, and is covered by the policy entitling plaintiffs to recover." The argument is that insurance contracts should be construed rather strictly against the insurer and ambiguities therein be resolved in favor of the beneficiary; that in this instance defendant itself recognized the ambiguity in the part quoted from the certificate and did make a change in the constitution; but that such change is unreasonable and not binding on members who became such prior thereto. The membership certificate contains this provision:

"This certificate, the constitution, by-laws and articles of incorporation of said order, together with the application for insurance signed by said insured member, shall constitute the contract between said order and said insured member and shall govern the payment of benefits, and any changes, additions or amendments to said constitution, by-laws or articles of incorporation, hereafter duly made, shall bind said order and said insured member and his beneficiary or beneficiaries, and shall govern and control the contract in all respects."

In view of such decisions as Modern Woodmen v. Mixer, 267 U. S. 544, 45 S. Ct. 389, 69 L. ed. 783, 41 A. L. R. 1384, and Supreme Council of Royal Arcanum v. Green, 237 U. S. 531, 35 S. Ct. 724, 59 L. ed. 1089, L. R. A. 1916A, 771, the binding effect of the change in the constitution of defendant must be recognized, and our own decisions, prior to the final opinion in Mooney v. Brotherhood of Railroad Trainmen, 162 Minn. 127, 202 N. W. 341, 204 N. W. 957, modified. The change here made in the constitution cannot be held unreasonable. Carbon monoxide from motor vehicles has of late years become a common mode of committing suicide. At most it specifies certain gases embraced in the general term of gas causing asphyxiation. The trial court correctly held that the insurance contract did not insure against death from carbon monoxide.

Error is assigned on the refusal to give each of three requested instructions. By the first one the word "violent" as used in the coverage clause was defined. The court deemed the definition confusing. The word is simple and is well understood by anyone fit to serve as a juror. The evidence was not such as to call for the application of degrees of violence. The next refused instruction told the jurors that plaintiffs "are not required to adopt or prove any special theory as to the exact nature of such means that caused said death, and are entitled to recover if you find that said death was caused by any external, violent, and accidental means covered by such insurance." Plaintiffs did attempt to prove that Palmer's death was caused by a fall, and defendant that his death was caused by inhaling carbon monoxide. There is not a particle of evidence of death by any other cause than one of the two mentioned, so there was no basis for the instruction. The last refused instruction was, for the reason just stated, objectionable. It reads:

"If you find from the evidence that deceased inhaled a quantity of carbon monoxide at the time in question and should further find that his death came wholly from other causes, then the inhaling of the carbon monoxide would not amount to a defense on the part of the defendant."

This is misleading. It ignores what plaintiffs had to prove in order to prevail. Furthermore, the court had fully instructed in terms of which plaintiffs cannot complain, that if the inhaling of the carbon monoxide occurred after Palmer, in an accidental fall, was rendered helpless, there could be a recovery. The requests were properly refused.

The order is affirmed.