# DOROTHY M. BECKMAN v. MARTIN C. SCHROEDER AND ANOTHER.[1]

July 18, 1947.

No. 34,397.

[1]Reported in 28 N. W. (2d) 629.

*A. E. Haering* and *Mordaunt & Carroll*, for appellant.

*Ray G. Moonan, John Sturner,* and *Harry E. Ryan,* for plaintiff-respondent.

MAGNEY, JUSTICE.

After verdict for plaintiff against one of defendants, the latter appealed from an order denying his motion for a new trial.

On March 3, 1945, at about 4 p. m., plaintiff's decedent, William G. Beckman, was riding as a passenger in a Pontiac automobile owned and operated by defendant Marcus Hertsgaarde, which car was being operated in a westerly direction on U. S. highway No. 212. About three miles east of Glencoe, said car collided with a Ford sedan owned and operated by defendant Martin C. Schroeder, which was being driven easterly. Beckman died from the injuries received in the collision. Each car owner blames the other, and neither charges decedent with contributory negligence.

Hertsgaarde testified that he had a clear and unobstructed view of the approaching Schroeder car for practically a mile; that he was driving in the north lane at 35 to 40 miles an hour up to the time of the accident; that when the accident was apparent he put on his brakes and slowed down to 25 to 30 miles per hour; that when the Schroeder car was about 75 or 100 feet away it made a sudden turn and came over the center line and struck Hertsgaarde's car. He described the accident as follows:

"* * * it just seemed like in one second the car was coming for me, and the next second I was hit; that was all there was to it; * * *.

* * * * *

"* * * As I say there was nothing wrong with the control of the car at the time I saw it or watched it casually, then all of a sudden it seemed it went out of control at the high rate of speed and into my lane * * *."

He estimated the speed of the Schroeder car as being in excess of 60 miles an hour.

Schroeder testified that he saw the Hertsgaarde car approaching about half a mile away. The road was substantially level. He said that he saw the Hertsgaarde car turn out and pass something; that it went back to its own side of the highway and commenced zigzagging; that Schroeder was then driving 30 to 35 miles an hour and the Hertsgaarde car 50 to 55 miles an hour. In Schroeder's own words:

"After it had its highest speed it got out of control, and then it got zigzagging across the center mark, and all at once she took a crosscut on the pavement, and then she come about, I would say, 100, 150 feet, she come straight ahead of us."

Schroeder said that when the Hertsgaarde car was about 150 feet away it headed straight for his car. When Schroeder saw the Hertsgaarde car zigzagging, according to his testimony, he "turned off," driving with his left wheels still on the pavement, probably a foot or so, the rest of the car being on the shoulder. Just before it was hit, he said his car was going about 10 to 15 miles an hour, and that the Hertsgaarde car came clear over to the south side of the pavement "to strike" his car.

One of these versions of the happening of this accident is obviously false, given deliberately so or unintentionally. The latter seems improbable.

When the cars came to a stop after the collision, the Hertsgaarde car was heading in a southwesterly direction, angling across the center line of the highway, with the left front wheel extending about three feet into the south lane and the right front wheel just over the line to the south. Commencing about ten inches north of the center line was a sideways skid mark running northwesterly up to the rear left wheel, as if the wheel had been pushed sideways. There was a faint similar skid mark running in the same direction to the right rear wheel.

When it came to a stop, the Schroeder car was off the pavement on the south side of the highway, heading in a northwesterly direc-

tion and a little east of the Hertsgaarde car. It was entirely on the shoulder, with the right front wheel nearest the pavement and about four or five feet from it, and the left rear wheel in the ditch farthest away from the pavement.

The left front of each car was smashed in, and the tire on the left front wheel of each car was deflated. Plaintiff and Hertsgaarde claim that the cause of the accident was the sudden blowout of the tire on the left front wheel of the Schroeder car, which tire they claim was old and defective. They claim that this blowout caused the Schroeder car to turn suddenly to the left and cause the collision.

Evidence by other witnesses and the exhibits show that debris was spread mostly on the south slab of the pavement. There was no snow on the highway except in the ditch on the south side. There were wheel tracks in this snow for a distance of about two or three feet, showing that the Ford after getting into the ditch had run ahead westerly for that distance. No wheel tracks led from the Ford to the pavement. The witness Kramber was driving a laundry truck westerly about one-fourth to half a mile to the rear of the Hertsgaarde car. He testified that he saw the Schroeder car turn to its left. Its rear end raised up, went to the right, "and she came down and sat right on the shoulder in the ditch." It was completely off the ground and landed in the snow. As it hit the snow, it jumped forward. The Hertsgaarde car sort of moved sideways.

The jury found for defendant Hertsgaarde, and against defendant Schroeder in the sum of $10,000. Schroeder moved for a new trial, which was denied.

Schroeder contends that the court erred in receiving the testimony of deputy sheriff Ed Stoeckmann and highway patrolman U. J. Eichten, over objection, upon the grounds that certain testimony of these two witnesses was mere speculation and conjecture and invaded the province of the jury.

Stoeckmann, a deputy sheriff of McLeod county, was called as a witness for plaintiff. He had served as deputy sheriff about four years and had investigated 50 to 75 automobile accidents. He arrived at the scene of the accident about 25 minutes after its occur-

rence and noticed the position of the cars, the debris, the skid marks, and other surrounding physical facts. He was asked:

"Q. Now, from your examination of the track, and the position of the automobiles after the happening of this accident, the condition of the automobiles, and calling on your experience as having investigated 50 to 75 accidents, and your knowledge of automobiles, are you able to, and can you tell us what in your opinion would have been the movement of the Hertsgaarde or Pontiac automobile to make this skid mark?"

The court overruled the objection, which was based on the ground that the question called for a conclusion of the witness based on speculation and conjecture and that it invaded the province of the jury. The answer of the witness was:

"A. * * * These automobiles, according to my view, were coming along this way [illustrating with miniature cars], and here is what took place when it happened. Here, this car lifted up, and flew down over here alongside of the shoulder, and when it hit here in front it stopped this Pontiac practically right in its tracks, and the momentum of this car carried the front end over the center line, and that is what caused the skidding leading up to the left rear wheel."

Defendant's counsel made the same objection to the following question put to the same witness:

"Q. Will you explain your opinion why the Schroeder automobile was on the shoulder facing in the opposite direction in which it was going?"

An objection to this question was overruled, and the witness answered:

"A. The Schroeder automobile going east, the Hertsgaarde coming west, they come along here, and the force of it just raised it up, and carried it over here just facing the opposite direction, and by so doing, by hitting this Pontiac, it carried it along and twisted it

in this direction, and here from the center line over to the left rear wheel is where you have got your skid."

Later on he was asked:

"Q. Will you show us by demonstration what you found there?"

There was an objection.

"A. When these cars came along like this, in my opinion this is what happened. This car came over here—

"Q. Which car do you refer to?

"A. The Schroeder car, going east; this is the Hertsgaarde car going west; this car picked itself up, carried this other car along, and it flew over here, and it fell down in the snow, and the momentum of this automobile driving along, motor running, wheels turning, after it settled down, it crept ahead like this to the west, and there were tracks anywheres from 2, 2½ to 3 feet long behind the wheels. They just settled in the snow and then came ahead."

Later on he was asked this further question:

"Q. Can you state in your opinion as to whether or not the Schroeder car was coming at a fast and rapid rate of speed or not?"

An objection to this question was overruled, and the witness answered:

"A. It apparently must have been to take that car and go through the movements that it did at the time of the collision, and land in the ditch there."

Eichten, a highway patrolman for eight years, who claimed he had investigated 60 accidents a year, was also called as a witness by plaintiff. He did not see the accident but arrived shortly after it occurred and noted the situation. He was asked:

"Q. * * * are you able to determine where this accident occurred, this collision occurred on the highway?"

An objection made on the same grounds as those made in connection with the testimony of the other witness was overruled, and the witness answered:

"A. Well, my opinion of it is that it happened in the center of the highway, in the north half.

"Q. Can you demonstrate by the use of these cars, your opinion, by way of illustration, assuming this white line to be the center line of the highway, and this to be west, and that end to be east.

"A. Well, my idea of this accident is this: this Hertsgaarde car coming here, the Schroeder coming here, the Schroeder car dashed over the center line coming at a high rate of speed, rose through the air, taking this car with it, landing over here in the snow, and the momentum of the wheels drove it forward about four feet."

He was also asked:

"Q. * * * are you able to express an opinion as to the speed or momentum of the Schroeder car at the time this accident occurred?"

This was objected to and overruled. He answered:

"A. Well, my opinion is due to the location of the cars after the accident, skid marks that were made, and the marks made by the Schroeder car plowing forward, that the Schroeder car must have been traveling at a much greater speed than the Hertsgaarde car, and the reason for that is that the Hertsgaarde car was stopped almost in its tracks, whereas the Schroeder car continued on through the air, landing in the snow, and plowing forward."

In Romann v. Bender, 190 Minn. 419, 424, 252 N. W. 80, 82, this court said:

"* * * What will happen when two cars meet head-on or at an angle, one or both going from 30 to 40 miles per hour just before meeting, is beyond safe prediction; and especially it is so when their drivers are consciously or involuntarily seeking to direct their movements. Surprising results sometimes follow, and after a collision the markings on the cars and on the road and the location of the cars are not sure proof of just how the accident happened, though they may be helpful to the jury. * * * The most that can be said for the physical facts is that they were of aid to the jury in reaching a result favorable to the plaintiff or favorable to the de-

fendant but not conclusive of how the accident happened. The law attaches to them no certain conclusion, and none of them were of a character demonstrating that the plaintiff had no cause of action."

So, in this case, surprising results followed the collision. There was a brake, accelerator, and steering wheel on each car, under the control and direction of each driver. Voluntary or involuntary actions on the part of either driver or both could determine the result of the collision as well as cause it. Natural laws in such a situation are not free to operate. Human intervention can and does have a determining influence.

In the fact situation here, Schroeder contends that the jury was as competent to form an opinion as to the happening of this accident as the officers called as expert witnesses.

Boiled down, what it amounts to is that Stoeckmann was asked his expert opinion on the following questions: (a) The cause of the skid marks; (b) the cause of Schroeder's car being on the south shoulder facing northwest after the accident; (c) the facts of the happening of the accident, by demonstration with miniature cars; and (d) whether the Schroeder car was traveling at a fast or rapid rate of speed. The witness Eichten was asked his expert opinion on the following questions: (a) The place where the accident occurred on the highway; and (b) the speed and momentum of the Schroeder car at the time of the accident.

The trial court determined that Stoeckmann and Eichten qualified as experts and permitted them to give expert opinion. The preliminary question whether a witness offered as an expert has the necessary qualifications is for the trial court and is largely within its discretion. The nature of the work in which these witnesses were engaged and the length of time they had been engaged in such work justified the court in determining that they had the necessary qualifications. Sneda v. Libera, 65 Minn. 337, 68 N. W. 36; McDonough v. Cameron, 116 Minn. 480, 134 N. W. 118; Cochran v. Stein, 118 Minn. 323, 136 N. W. 1037, 41 L.R.A.(N.S.) 391; Emerson v. C. B. & Q. R. Co. 120 Minn. 84, 138 N. W. 1026; Noe v. G. N.

Ry. Co. 168 Minn. 259, 209 N. W. 905; Moeller v. St. Paul City Ry. Co. 218 Minn. 353, 16 N. W. (2d) 289, 156 A. L. R. 371.

In Palmer v. Order U. C. T. 191 Minn. 204, 206, 253 N. W. 543, 544, the court said:

"* * * It is for the trial court to determine whether a witness qualifies as an expert. 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 3335. Wigmore in his work on evidence sums up his conclusions on the qualifications of expert witnesses in § 561 by this suggestion of what the rule for the future ought to be, viz:

" 'The experiential qualifications of a particular witness are invariably determined by the trial judge, and will not be reviewed on appeal.' "

■ The competency of an expert witness is thus addressed to the sound discretion of the court. The question then arises whether the determination that expert evidence applies to the subject matter rests also in the sound discretion of the trial court. In McDonough v. Cameron, *supra,* this court stated (116 Minn. 483, 134 N. W. 120) :

"The question whether expert evidence is admissible in any particular case has come to be in this court, whatever may be the rule elsewhere, one resting largely in the discretion of the trial court. The court in this instance might perhaps without error have excluded this evidence; but from that it does not follow necessarily that it was prejudicial error to admit it. In other words, we are clear that the learned trial court did not abuse its discretion in receiving the evidence. No prejudice resulted therefrom. The rule applies, not only to the subject-matter, but to the competency of the expert." (Citing cases.)

In the Noe case, the court, however, limited the rule by saying as follows (168 Minn. 261, 209 N. W. 906) :

"In McDonough v. Cameron, supra, it is said in substance that the question whether expert evidence applies to the subject matter is also in the discretion of the trial court. We think however that such evidence should be received only where the subject matter is complicated or its operation difficult and embracing matters either

in construction or operation not of common knowledge. When the subject matter of inquiry lies outside the range of common knowledge expert evidence is admissible. Greer v. G. N. Ry. Co. 115 Minn. 213, 132 N. W. 6. When expert testimony is competent the witness is frequently called upon to express an opinion on the very issue to be determined by the jury."

In commenting on the facts in that case, the court said that a situation was presented as to which the jury was as capable of determining the facts as the witness. It said (168 Minn. 261, 209 N. W. 906):

"* * * The element involved does not embrace anything beyond the intelligence of an average jury and does not partake of or involve anything in the nature of a science necessitating a course of previous study to answer the inquiry. In other words the circumstances and facts were of a character equally within the knowledge and comprehension of a jury as of a witness."

In Krippner v. Biebl, 28 Minn. 139, 9 N. W. 671, it was held that where the fact was material as to how far a fire in stubble land would be liable to "jump" a fire-break, under certain conditions of wind and vegetation, it was competent for a witness, shown to have had actual knowledge of such conditions and sufficient experience with such fires, to give his judgment or opinion as to such fact. The court said (28 Minn. 142, 9 N. W. 672):

"* * * A material question of fact, for the determination of the jury, was whether the precautions taken by the defendant to prevent the spreading of the fire were such as common prudence required. This would depend upon the existing conditions in respect to the wind, and the dryness of the vegetation upon the ground, with which the witness was acquainted, and upon the fact as to how far, under such conditions, a fire in the stubble might be carried in the air, or 'jump,' as it is expressively termed. As to this latter fact, we think it is not one of common knowledge, concerning which it could be presumed that the jury could form a judgment as well as a witness, who, from actual experience, had become capable of judg-

ing with some degree of accuracy. We cannot assume that the jurors were all farmers, or that they were possessed of knowledge or experience upon the subject. The law is thus well expressed in 2 Taylor, Ev. 1275: 'It may be laid down as a general rule that the opinion of a witness possessing peculiar skill is admissible whenever the subject of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance.' "

In Anderson v. Fielding, 92 Minn. 42, 47, 99 N. W. 357, 359, 104 A. S. R. 665, this court said:

"* * * Whenever in the trial of a cause the subject of inquiry is a matter which lies so far outside the range of common knowledge and experience that the jury are presumably unable to pass upon it intelligently without the assistance of the opinion of persons possessing peculiar skill and knowledge in the premises expert or opinion evidence is admissible. But such evidence is not admissible where the facts are such that, when placed before the jury and explained to them, they are as competent as the experts to form an opinion.

"There is no controversy as to this rule, but the difficulty lies in its application, * * *."

In 20 Am. Jur., Evidence, § 817, the rule is stated as follows:

"The general rule is that opinions as to the cause of a particular occurrence or accident given by witnesses possessing peculiar skill or knowledge—that is, experts—are admissible where the subject matter is not one of common observation or knowledge, or, in other words, where witnesses because of peculiar knowledge are competent to reach an intelligent conclusion and inexperienced persons are likely to prove incapable of forming a correct judgment without skilled assistance.

\* \* \* \* \*

"It is clear that an expert will not be permitted to give opinions as to the cause of a particular occurrence or accident, where the subject matter of the inquiry is of such a character that it may be

presumed to lie within the ordinary experience of all men of common education, moving in ordinary walks of life; in such case the jury itself is competent to draw all necessary conclusions from the facts."

In Tracey v. City of Minneapolis, 185 Minn. 380, 383, 241 N. W. 390, 391, this court said:

"It is the rule that the opinions of expert witnesses are admissible whenever the subject of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance. If the expert cannot add anything valuable to that which the jury already have, he should not be heard. But the mere fact that the expert covers the very issue that the jury has to pass upon does not necessarily call for its exclusion. State v. Cox, 172 Minn. 226, 215 N. W. 189. It is the rule however that the testimony of experts should not be received when the facts are such that, when placed before the jury and explained to them, they are as competent as the experts to form an opinion."

And in Westereng v. City of Morris, 205 Minn. 219, 222, 285 N. W. 717, 719, we stated:

"The opinions of experts are admitted 'in order to assist a jury [or other trier of facts] in arriving at the truth, and such evidence is admissible whenever the subject matter of the inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance.' Wyatt v. Wyett, 200 Minn. 106, 110, 273 N. W. 600, 601."

In Sneda v. Libera, 65 Minn. 337, 68 N. W. 36, it was held that the general rule laid down in respect to the admission of expert opinion evidence is that the opinions of witnesses possessing peculiar skill are admissible whenever the subject matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance.

In Mantel v. C. M. & St. P. Ry. Co. 33 Minn. 62, 65, 21 N. W. 853, 855, we find this statement:

"* * * As to those [certain rulings], we will say that whether this or that act of plaintiff or defendant was negligence, and whether due care required this or that to be done, are not matters for expert testimony. They are not matters of science or skill, as might be such a question as how long it would take to stop a train of cars or a street car going at a designated rate of speed, but they are matters of judgment and common experience, to be determined, upon the facts and circumstances of the case, by the jury, who are as competent to determine them as any witness can be."

Were the questions upon which expert opinion evidence in this case was offered and received such that the jury was presumably unable to pass upon them intelligently without the assistance of the opinion of persons possessing peculiar skill and knowledge in the premises? Here, the evidence given by the officers in question undoubtedly had great influence and weight with the jury and may have been the determining factor in bringing about the resulting verdict. This is not a case where we may say that, whether the evidence was properly or improperly received, it was of small materiality, and, if error, no prejudice resulted. The testimony of these two witnesses in fact reconstructed the accident for the jury; and, in view of their official positions, their opinions must have had great influence on the jury.

In Carson v. Turrish, 140 Minn. 445, 451, 168 N. W. 349, 352, L. R. A. 1918F, 154, the court said:

"A witness who had considerable familiarity with autos, their make, equipment, operation and driving, was at the scene of the collision the morning following. He testified as to the wheel marks which he found on the pavement and gave his opinion of what they indicated relative to the movement of the defendant's car. The witness was sufficiently qualified to give an opinion. The conditions were so nearly as at the time of the accident that it was not error to receive his testimony and it might be of value to the jury. It had the tendency to contradict the testimony of the chauffeur as to the movements of his car and was receivable in rebuttal."

In Moeller v. St. Paul City Ry. Co. 218 Minn. 353, 16 N. W. (2d) 289, 156 A. L. R. 371, it was held that there was no error in admitting the testimony of an expert as to the speed of a streetcar, notwithstanding the fact that he had not witnessed the accident, had never operated a streetcar, and was not familiar with the character of its brakes. The witness was a graduate civil engineer and was associated with a testing laboratory on engineering problems. The opinion was based on the assumption of certain facts and not on an opinion. The witness used a certain formula called the "coefficient of friction." The court there said (218 Minn. 363, 365, 16 N. W. [2d] 295, 296):

"* * * The speed at which a vehicle is being operated may, like any other fact, be established by circumstantial evidence. In a number of cases experts have been allowed to give opinions as to rate of speed, based not upon their observation of the moving vehicle, but upon skid marks or other impressions made just before or at the time of the accident or collision. [Citing cases.]

\* \* \* \* \*

"* * * A wide latitude of discretion is given the trial court in the determination of the admission of expert testimony. 2 Dunnell, Dig. & Supp. § 3325, and cases cited."

This is not a case like Lestico v. Kuehner, 204 Minn. 125, 283 N. W. 122, where an admitted expert on tires was not permitted to testify whether the air was suddenly or gradually let out of a punctured tire. Such a matter was not within the knowledge or experience of the average juror. The court stated in that case (204 Minn. 132, 283 N. W. 126):

"The record presents another ruling which we consider erroneous. A mechanic with 'lots of experience with tires, due to wrecks,' testified that he had an opinion as to 'whether the air was suddenly deflated * * * or * * * gradually let out' of the punctured tire. The objection was sustained for lack of foundation and because 'it is not a subject of expert testimony but pure speculation on the part of the witness.'

"In rulings on opinion testimony the trial judge has a wide discretion. But it is a judicial discretion to be exercised favorably to any honest course capable of eliciting relevant truth.

"There were no rim cuts and no injuries to this casing other than the puncture. We think the witness in question should have been permitted to state his opinion that the tire itself indicated whether it had been suddenly or gradually deflated. Mechanics whose business it is to repair tires, especially those emerging from wrecks, have a broad experience far beyond the ordinary. Thereon, as to causation, they may sometimes come to worth-while conclusions based upon the inherent evidence of damaged casings. We see no reason why such opinions should not be admitted where, as here, there is enough foundation. Their weight will be for the jury, if any remains after the test of cross-examination."

But here the cause of the Schroeder car being on the south shoulder facing northwest after the accident, the place where the accident happened, and reconstruction of the accident by the use of miniature cars were matters which were as much within the knowledge of the average juror as that of an opinion witness. No question of science, art, or technical learning was involved. The situation here is no different from that discussed in Noe v. G. N. Ry. Co. 168 Minn. 259, 261, 209 N. W. 905, 906, *supra,* where the court said that the element involved did not embrace anything beyond the intelligence of an average jury and did not partake of or involve anything in the nature of a science necessitating a course of previous study to answer the inquiry. "In other words," the court said, "the circumstances and facts were of a character equally within the knowledge and comprehension of a jury as of a witness." For instance, whether this collision took place on the north lane or slab of the highway or the south lane or slab was a fact which the average jury had the knowledge and comprehension to determine. The circumstances and facts here were of a character as much within the knowledge and comprehension of a jury as of a witness. The function of experts is stated in 2 Dunnell, Dig. § 3334, as follows:

"The ordinary function of experts is to assist the jury, by their superior knowledge in reaching a correct conclusion from the facts in evidence."

In this case, in determining whether the accident happened on or the other side of the center line, the jury was as competent to make the decision as an opinion witness. No superior knowledge was required. The debris was practically all south of the center line; the Schroeder car was several feet south of the south slab of the pavement when it came to rest after the collision; the front of the Hertsgaarde car was over the center line and into the south lane several feet. In our opinion, the jury was as competent to determine where this collision took place as the experts, and the place where this accident occurred is the crucial question in this case. No doubt the official position of these experts carried great weight with the jury in locating the place of the collision in the north lane.

■ Schroeder also contends that the court erred in permitting the testimony of highway patrolman Eichten over objection that certain of his testimony was confidential, and that it violated the provisions of M. S. A. § 169.09, subd. 13. Since this statute was amended by L. 1947, c. 114, Schroeder is not pressing the point, as, in the event of a new trial, the testimony would be admissible.

■ Schroeder also contends that the argument to the jury of the attorney for plaintiff was so prejudicial as to entitle him to a new trial. We shall not detail the claimed prejudicial statements. Every litigant in court is entitled to a fair trial. The statements made by plaintiff's attorney to the jury did not aid Schroeder in getting the fair trial he was entitled to. Any litigant or attorney who loses a case before a jury is naturally disappointed, but if he also has reason to feel that the case was lost through prejudicial statements made by opposing counsel, bitterness is added to the disappointment. Since we have disposed of the case favorably to appellant on other grounds, it is not necessary here to determine the merits of his contention in this respect.

Order reversed.