# GEORGE DYSON v. RICHARD SCHMIDT AND ANOTHER.

109 N. W. (2d) 262.

May 5, 1961—No. 38,029.

*Robert J. Swords,* Corporation Counsel, and *Donald L. Lais,* Assistant Corporation Counsel, for appellants.

*Alfred A. Burkhardt, Robert R. Dunlap,* and *John A. McHardy,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal from an order of the district court.

The action arises out of a gunshot wound inflicted on the plaintiff, George Dyson, on March 28, 1957, at the Riviera Theater in St. Paul, where he was employed as assistant manager. Plaintiff brought this action for damages against Richard Schmidt and Earl Harken, police officers in said city, alleging that they negligently shot him while in pursuit of a criminal suspect in the theater. Defendants answered separately, each denying that he was negligent and alleging that he was in the performance of his duty as a police officer attempting to apprehend an armed criminal. The jury returned a verdict against both defendants jointly and severally. Their motion for judgment notwithstanding the verdict or for a new trial was denied and they appealed to this court from said order.

The pertinent facts are substantially as follows:

Defendant Schmidt had been an officer on the St. Paul police force since July 1955. Shortly before March 28, 1957, he was assigned

to a special detail which was working out of the morals division to check downtown areas for molesters. Defendant Harken had served on the St. Paul police force since 1936 and had also been assigned to the same special detail.

On March 28, 1957, Harken and Schmidt entered the Riviera Theater at about 6 p. m. and seated themselves in the auditorium. They were dressed in ordinary business suits, each armed with a .38 caliber police revolver worn in a holster attached to the hip, with suit coats and topcoats over their pistols. Schmidt was seated on the left aisle and Harken on the right aisle. While seated there, Schmidt observed a man who resembled the description and photograph of one William Rankin, a criminal suspect wanted for participation in several armed robberies. Schmidt thereupon left the theater auditorium and went into the lobby where he contacted plaintiff.

After answering plaintiff's inquiry as to why the officers had arrested a couple at another theater that afternoon, Schmidt stated, according to plaintiff, "I'm afraid something is going to break in here pretty soon." He then asked plaintiff to go into the auditorium and get Harken, which he did. Plaintiff said that Harken and Schmidt stopped close to the drinking fountain and that he went into the outer lobby. Schmidt testified that he told Harken of his suspicions that Rankin was in the theater.

Thereupon, Harken returned to the auditorium in an attempt to get a view of Rankin. Although Harken saw the man, he said that he was not absolutely sure of his identity so he returned to the lobby and suggested to Schmidt that they had better wait for the intermission which was about to occur in order to get a better look. The defendants testified to the effect that they had information that Rankin was a dangerous man who had participated in several armed robberies and a person likely to be armed and likely to resist arrest with force of arms.

While waiting for the intermission, the officers discussed whether they should call in reinforcements. This idea was rejected as it would have meant uniformed patrolmen and, as Harken testified, "there would be a lot of curiosity and outsiders would want to know what

the police officers were doing, and more apt to be others getting hurt."

Harken said that at the intermission several people came out of the auditorium followed by a man wearing a black leather jacket and khaki trousers, the same man whom the officers had seen. They observed him again as he walked down the corridor toward the lobby, so they followed him into the inner lobby. Harken told Schmidt that he would challenge the suspect for his identification. Thereupon the detective walked by Rankin and, after getting beyond him, turned and walked directly to the suspect showing the latter his badge. He told the suspect that he was a police officer and that he wanted some identification from him. As he did so the suspect reached into his leather jacket and pulled out a .22 caliber pistol. The officers stepped back as Rankin ran for the only open door to the outer lobby. When he got to a certain spot in the inner lobby, he turned around and fired one or two shots in the direction of the officers—Schmidt said two shots. Then Rankin again started for the open door. Harken said that it was impossible for him to shoot at that time as the suspect was in a general line with the candy counter and that there were one or two women working behind it.

Schmidt testified that as soon as the suspect pulled out the pistol, he jumped back into the corridor, which separated him from Rankin by a wall. Schmidt then removed his own pistol from the holster and stepped back into the lobby with his pistol pointed in the direction of Rankin. At that time Rankin was running toward the open door leading from the inner lobby to the outer lobby. Schmidt cautioned him to stop, stating to the suspect that he was a police officer. He said that he fired two shots at Rankin before the latter left the inner lobby. One of the shots fired by Schmidt hit Rankin and the other hit the plaintiff, who was standing beside the third door in the outer lobby of the theater. The officers chased Rankin out of the theater and in a few minutes apprehended him in the alley behind the theater.

On the night of the shooting plaintiff was taken to a hospital for the removal of the bullet and was confined there until about April 18. It appears from the record that he was subsequently hospitalized and under a physician's care; and that he had suffered continual pain,

which had not prevented him from continuing his employment but had curtailed some of his activities.

Defendants raise numerous legal issues and assignments of error. We shall consider the ones which we deem pertinent to a determination of this appeal. Assignments of error not argued in appellant's brief are deemed waived. Raymond v. McKenzie, 220 Minn. 234, 19 N. W. (2d) 423.

■ The first and most important legal question raised is whether a police officer is liable to a person accidentally shot by the officer in returning fire when fired upon by an armed criminal suspect whom the officer is attempting to apprehend. Defendants cite Minn. St. 629.34, subd. 3, which provides that a peace officer may, without warrant, arrest a person when a felony has been committed and he has reasonable cause for believing the person arrested to have committed it.

Defendants contend that they are within the ambit of privilege as set out in Restatement, Torts, § 75:

"An act which is privileged for the purpose of protecting the actor from a harmful or offensive contact or other invasion of his interests of personality does not subject the actor to liability to a third person for any harm unintentionally done to him unless the actor realizes or should realize that his act creates an unreasonable risk of causing such harm."

They argue that under the circumstances here, where a felon was firing at the officers, with bullets flying from his gun in the direction of the auditorium and of other personnel in and about the theater, there was not such an unreasonable risk of injuring a third person as to preclude officer Schmidt from firing without rendering him liable to the plaintiff for injuring him thereby.

Defendants set out the following illustration from Restatement, Torts, § 75, which they claim is in point:

"A points a pistol at B threatening to shoot him. B attempts to shoot A, but his bullet goes astray and strikes C, an innocent bystander. B is not liable to C unless, taking into account the exigency in which A's

act placed B, B fired his self-defensive shot in a manner unnecessarily dangerous to C."

They contend that the facts in this case are even stronger in favor of nonliability on the part of officer Schmidt, since Rankin not only pointed his pistol at Schmidt, but in fact fired two shots at the officer. Plaintiff was concealed from Schmidt's view at that time by a wooden door. Defendants claim that Schmidt had no knowledge of plaintiff's presence at that point.

While defendants recognize that this is a case of first impression in Minnesota, they urge the correctness of the Restatement rule and assert that New York has adopted it, citing Scott v. City of New York, 2 App. Div. (2d) 854, 155 N. Y. S. (2d) 787, and Meistinsky v. City of New York, 128 N. Y. S. (2d) 483, reversed on other grounds, 285 App. Div. 1153, 140 N. Y. S. (2d) 212, affirmed, 309 N. Y. 998, 132 N. E. (2d) 900. Defendants also cite United States v. Jasper (4 Cir.) 222 F. (2d) 632.

We have examined those cases but in none of them are the facts the same as in the instant case. The two New York cases involved actions arising out of the alleged negligence of certain police officers. In both of those cases the officers were placed in positions, through no fault of their own, which necessitated their acting in the stress of emergency.

In United States v. Jasper (4 Cir.) 222 F. (2d) 632, a military police sergeant, in an effort to subdue a mob while arresting a drunken soldier, drew a pistol and fired five shots downward in front of the crowd and one of the bullets ricocheted off the pavement and hit an innocent bystander across the street. The lower court, sitting without a jury, held that the act of the sergeant was a negligent one and entered judgment for the plaintiff. The appellate court reversed, stating that acts performed under the stress of emergency are to be judged for negligence with a different measure from that used in weighing acts performed under normal conditions.

Plaintiff contends that in the instant case the officers found themselves in a position where shooting was necessary as a result of their own lack of care in approaching the suspect. He maintains that the

emergency in this case was created by the officers themselves and that they should be held responsible for the ultimate result. It is his position that the testimony here showed that Rankin, the suspect, was a person likely to be armed and likely to resist arrest with force. Plaintiff, therefore, contends that defendants are answerable for negligence in the performance of their official duties to plaintiff, who suffered injuries by reason thereof, citing Edberg v. Johnson, 149 Minn. 395, 184 N. W. 12, and Annotation, 60 A. L. R. (2d) 873, 879. We held in the Edberg case that although a police officer is not chargeable with a violation of the Motor Vehicle Act solely because he operates a motorcycle in a manner prohibited by the act while pursuing a lawbreaker to place him under arrest, the officer is required in such pursuit to observe the care which a reasonably prudent man would exercise in the discharge of official duties of a like nature under like circumstances.

Plaintiff cites Askay v. Maloney, 85 Ore. 333, 166 P. 29. In that case the passenger in a passing trolley car was injured by a policeman shooting at a person who he had reason to believe was a felon and who in fact was later convicted of a felony. The court held that, although under the circumstances the officer was justified in shooting at the felon to prevent his escape, it was a jury question as to whether or not he was negligent in hitting the plaintiff. It was also held that although a peace officer might discharge a weapon under the circumstances stated and his act be justified, if, however, the shooting was done in a public place, where the officer understood or should have known people were in the habit of congregating or were likely to pass, the act might constitute such negligence as to render the officer civilly liable for any injury that he might inflict upon an innocent person.

On a second appeal of the case, the court said (Id. 92 Ore. 566, 579, 179 P. 899, 903):

"A street is not a sanctuary for a robber, and the officers had a right to exercise their prerogative of arresting the felon wherever they might find him, whether in the street or in some secluded spot. The mere act of their shooting at him was not unlawful or negligent *per se,* because as to the arresting officers it was authorized by statute. Of course, it was their duty to act with reasonable prudence to avoid the injury of

innocent persons, and the care must be commensurate with the danger involved. It goes without saying that a greater *quantum* of caution should be observed in firing upon him with pistols than if they were grappling him with their hands. Whether they were negligent under all the circumstances of the case, as a result of which the injury was inflicted, was a question for the jury to determine according to the preponderance of the evidence upon a consideration of the whole case."

Davis v. Hellwig, 21 N. J. 412, 122 A. (2d) 497, 60 A. L. R. (2d) 866, cited by plaintiff, was an action against a police officer for negligence in the shooting of a bystander. While in a department store, the officer's attention was called to a man who had apparently stolen some merchandise, later found to be worth $36.87. The alleged thief ran out into the street, and the officer followed. It was a narrow street in a busy shopping district. When the man failed to stop, the officer shot at him from the sidewalk. The bullet was deflected and hit the plaintiff, who was walking on the opposite sidewalk. The officer testified that he did not look to see how many people were in the street but only to see if anybody was in the direct line of fire. The jury returned a verdict in favor of defendant, and a motion for a new trial was denied. The Superior Court, Appellate Division, reversed and directed that a new trial be granted. Id. 37 N. J. Super. 569, 118 A. (2d) 83. The Supreme Court of New Jersey affirmed, but stated that the decision of the Superior Court was based on an erroneous application of the general rule that while a police officer may shoot a fleeing offender charged with a felony, he cannot do so where the charge is only a misdemeanor. Pointing out that the offense was of such a nature that the officer's actions were legally justified under that rule, the Supreme Court nevertheless held that plaintiff was entitled to a second trial by a new jury under proper instructions on the issue of the officer's negligence in shooting at the time and place he did.

In denying defendants' motion for judgment notwithstanding the verdict or for a new trial in the instant case, the trial court in its memorandum took the position, as we must also do, that the evidence must be reviewed in the light most favorable to the prevailing party. It was also of the opinion, upon a review of its instructions, that the primary

issues were the standard of care required of the defendants and whether or not their conduct, if negligent, was the proximate cause of plaintiff's injuries.

The court instructed the jury that the defendants were police officers and had the duty, among others, to make arrests or apprehensions of any known criminal suspects and to use such force as was reasonably necessary to carry out that duty; also that if either or both of the defendants used the care which an ordinarily prudent police officer would have used under the same or similar circumstances, they would not be negligent, but, if they failed to do so, they would be. It explained that proof must be offered by a fair preponderance that the defendants failed to use the standard of care required of them at the time of the accident and further stated that existence of negligence by itself was not sufficient to establish liability but that the negligence must be the direct or proximate cause of the damage, defining proximate cause as follows:

"* * * Those consequences, and only those consequences, which follow in unbroken sequence without an intervening efficient cause from the original negligent act or omission are natural and proximate, and for those consequences the wrongdoer is responsible, whether he could have foreseen them or not."

With respect to defendants' claim that because Rankin drew a pistol and fired an intervening cause was interjected so as to break the chain of causal connection, it was the trial court's position that it could be said with equal force that the conduct of the officers caused Rankin to draw his pistol and fire; also that the emergency rule did not apply when the person claiming its benefit caused the emergency by his own conduct. The memorandum further stated:

"* * * From the evidence the jury could reasonably find that once the defendants were suspicious that the suspect was Rankin, better precaution could or should have been taken. First of all, they could have summoned additional help. There was ample time from the time of the first discussion as to strategy and the intermission, when the acts took place. When Harken approached Rankin, Schmidt was behind

Rankin, but his gun was not drawn. Then in pursuit, Schmidt fired, not knowing who was behind the door leading to the outer lobby and street. Harken cannot be absolved from blame merely because he could not fire. It was the manner of his initial approach which the jury could reasonably find triggered the reaction of Rankin. One must bear in mind that Rankin was a known criminal—dangerous—and likely to be armed. Did the defendants use that care required of a prudent policeman? The jury decided that they did not * * *."

In denying defendants' motions the trial court concluded that under the circumstances it could not invade the province of the jury and substitute its own findings of fact by granting judgment notwithstanding the verdict and that nothing could be accomplished by granting a new trial.

Although the question as to the liability of police officers to an innocent bystander under the circumstances here is one of first impression before this court, the general rule seems to be that a police officer is personally liable for negligent or wrongful acts causing personal injury or death. Annotation, 60 A. L. R. (2d) 873, 879.

It is our opinion that it was a question for the jury whether the officers should have approached the suspect in the theater lobby under the particular facts and circumstances here. There appears to have been ample time, between their first discussion as to strategy and the intermission, to summon additional help, which was not done. They had information that the suspect was dangerous and likely to be armed and to resist arrest by force of arms if necessary.

When officer Harken, following the plan which he had previously discussed with Schmidt, confronted the suspect and asked for identification, it amounted to an invitation to the suspect to reach in his pocket and bring out and use his revolver. This created a situation which both officers expected might happen, according to their testimony, if the man were Rankin. For the officers to act as they did with such a dangerous suspect as Rankin in our opinion raised a jury issue as to whether their action in creating such a situation constituted negligence and, if so, whether it was the proximate cause of plaintiff's injuries.

We realize that great care must be exercised in laying down a rule of law pertaining to liability of law-enforcement officers in the performance of their duties in apprehending felons. In our opinion the rule should be that an officer, confronted with a sudden emergency, where it appears that a person is committing a felony or is threatening or endangering the life of the officer or others, should not be held liable for negligence in the event that a bullet goes astray and hits a bystander. However, this rule should not prevail under circumstances, such as here, where a jury question existed as to whether the conduct of the officers created a situation which brought about the emergency.

■ Defendants claim that the trial court erred in instructing the jury as follows:

"* * * Concurrent causes of negligence are causes acting contemporaneously; that is, at the same time, and which together cause the injury which would not have resulted in the absence of either. Where the concurrent negligence of two defendants combines together and contributes concurrently as proximate causes of an accident, each becomes liable for the whole even though one may have contributed in greater degree to the happening of an accident."

The above instruction was taken substantially from Frank v. Stiegler, 250 Minn. 447, 84 N. W. (2d) 912. We have carefully considered defendants' arguments in connection with claimed error of the court in connection with the question of concurrent negligence. It is our opinion that under the evidence and circumstances here there was no reversible error in the court's charge on that point.

■ Defendants also raise the question whether ordinary juries are competent in the absence of expert testimony or other evidence to judge the acts of police officers in their effort to apprehend a suspect. They contend there was no evidence by expert testimony or otherwise upon which to base a finding that their acts were not the acts of ordinary, prudent police officers in St. Paul at the time and under the circumstances in question. In support of this contention they cite Weireter v. G. N. Ry. Co. 146 Minn. 350, 178 N. W. 887. That case involved the death of a watchman in a railroad switchyard, which presented

an entirely different fact situation. We do not regard it as controlling here.

The opinion of an expert witness is intended to be used only where, because of some superior learning or experience, the witness is more capable of formulating a correct opinion on the subject matter involved than are members of the jury. Carmody v. Aho, 251 Minn. 19, 86 N. W. (2d) 692. Expert evidence should be received only when the subject matter is complicated or its operation difficult and embracing matters either in construction or operation not of common knowledge. Beckman v. Schroeder, 224 Minn. 370, 28 N. W. (2d) 629. There is nothing in the record here to indicate to us that the jury was not competent to judge the acts of the police officers in apprehending the suspect without so-called expert testimony.

■ Defendants raise the question whether it was prejudicial error for the court to refuse their offer to prove that the plaintiff was compensated for medical bills under the Workmen's Compensation Act after plaintiff had testified that he had paid certain medical bills himself. They acknowledge in their brief that the general rule in Minnesota is that whether or not medical bills have been paid is not the test of recoverability in damages, and further recognize that this court has been strongly opposed to the introduction of insurance payments in personal injury cases where the matter of insurance is not a matter direct in issue. Nevertheless, they contend that the effort to establish the fact that plaintiff had paid these bills out of his own pocket, left the inference that he was obliged personally to pay the additional bills and thus created a situation where there was a false impression of this liability on his part, which played upon the sympathies of the jury in arriving at its verdict.

We do not believe this contention to be supported by the law or the evidence. In Dahlin v. Kron, 232 Minn. 312, 45 N. W. (2d) 833, we held that the defendant could not take advantage of the fact that the doctor's bill and expenses were paid for the plaintiff by a beneficial society, by members of his family, by his employer, or by other persons.

We have considered defendants' other assignments of error and

conclude that none of them constitutes such reversible error as would justify overruling the result of the trial court.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that defendants here were free from negligence as a matter of law.

MR. JUSTICE OTIS, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.