HEIDBREDER ET AL., APPELLEES, *v.* NORTHAMPTON
TOWNSHIP TRUSTEES; BENKO, APPELLANT.

(No. 9057—Decided March 21, 1979.)

*Mr. Howard L. Calhoun,* for appellees.
*Mr. Donald A. Powell,* for appellant.

MAHONEY, P. J.   Defendant Charles Benko, the Chief of
Police of Northampton Township, appeals the judgment of
$300,000 entered upon a jury verdict in favor of plaintiffs,
Robert W. and Holly M. Heidbreder and their minor son,
Jonathan R. Heidbreder. We affirm.

### *Facts*

This case was tried on the theory that defendant, while
acting in the scope and course of his employment, negligently
discharged his revolver at the driver of a fleeing automobile.
His action resulted in serious and permanent injury to plain-
tiff Jonathan R. Heidbreder. The automobile was occupied by
two men who were fleeing from the scene of an armed rob-

bery they had perpetrated shortly before their confrontation with Chief Benko. One of the first three, of a total of four shots fired by Benko, lodged in the brain of the plaintiff, a child almost three years of age. The evidence supports the inference that the bullet ricochetted off the rear of the robbers' automobile. The incident occurred November 19, 1975. The Northampton Township Trustees, the other defendants, were dismissed by summary judgment on the basis of sovereign immunity.

Benko had been a full time police officer for over four years. His .357 caliber magnum revolver was loaded with three 125 grain, high velocity, .38 caliber hollow point bullets, which were set to fire first, and three .357 caliber 125 grain magnum bullets. His police car contained a .12 gauge shotgun. Around noon, Benko was driving south near the intersection of Route 8 and Portage Trail when he received a report over his radio of an armed robbery at the "Red Barn," a fast food restaurant just north of his position. Benko proceeded to the Red Barn where he confirmed the robbery and learned that the escape was made in an old, white automobile. Benko proceeded north on Route 8 and learned that a patrolman, Kimerer, was being shot at and that the white automobile had turned west onto Chart Road. Benko then turned west onto Bath Road, which runs parallel to Chart towards Northampton Road and intersects Northampton Road south of Chart Road. Knowing the white automobile was still on Chart Road, Benko turned north onto Northampton.

The Northampton Elementary School stands at the intersection of Chart and Northampton Roads. Freda Schoonover's residence stands just south of the school at 3223 Northampton Road. Further south stands the residence of Dolph and Martha Heidbreder, Jonathan Heidbreder's grandparents, at 3205 Northampton Road, and a repair garage operated by plaintiff Robert Heidbreder at 3195 Northampton Road. Benko was familiar with this area. Plaintiff Holly Heidbreder was at her home on Chart Road. Robert Heidbreder, a volunteer fireman, kept police and fire radio receiving and broadcasting equipment in his home, and a monitor in the repair garage. Holly Heidbreder heard the robbery report and Officer Kimerer's report that the car turned onto Chart Road. Holly Heidbreder saw the automobile pass her window and enter the schoolyard.

With her radio equipment, she told the police department where the automobile was and not to go after it since "several hundred" children were on the playground.

Benko heard Holly Heidbreder's broadcast and swung his patrol car across the southbound lane, approximately thirty yards north of Freda Schoonover's residence. He got out with his shotgun and stood in the middle of the road behind his car. He saw the white Chevrolet coming south and swing over into the northbound lane. Benko testified that, as the robbers' car approached, he abandoned the shotgun for fear of striking the schoolchildren, 15 to 25 of whom were in the immediate area. As the robbers' automobile passed him at an estimated speed of 30 to 40 miles per hour, Benko testified that a hand holding a gun came out of the front side window on the passenger side. Benko saw only one robber in the automobile, the driver. Benko fell to the pavement. He jumped and saw the driver turn in his seat. Believing the driver could fire at him through the rear window, Benko fired four times in an effort to kill the driver. Benko testified that he saw only one other person in his line of fire, a Mr. Alden, who was heading into the Heidbreder garage area in his dump truck. This truck was stopped sideways and Mr. Alden was down in the cab. Benko said the robbers' car was about 30 yards past him when he completed firing. Plaintiffs introduced Benko's statement given the day after the incident to the Summit County prosecutor wherein Benko said the automobile was "approaching" the dump truck when he fired. This distance would be up to, or slightly over, about 132 yards. One of the .38 caliber rounds ricochetted off the back driver's side of the automobile and struck Jonathan Heidbreder, who was then in the repair garage, over 130 yards from Benko. Two eyewitnesses, Freda Schoonover and Donald Dannemiller, both heard two shots fired from Benko's direction. Neither of them saw or heard any guns or gunshots from the robbers' automobile. Plaintiff Robert Heidbreder also viewed the incident. He was working in his garage when he saw Benko speed by. Heidbreder went to the edge of the road and saw Benko with his shotgun. After the robbers passed the roadblock, he saw Benko fire two shots. Heidbreder placed the robbers approximately 60 yards past Benko when the shots were fired. He saw two persons in the automobile, the driver and another, ducked down in the front

passenger's seat. Heidbreder saw no gun come from the automobile. Jonathan Heidbreder was in the garage with his grandmother, Martha Heidbreder. She heard parts of the broadcast over the monitor there and apparently believed the child was in some danger. Jonathan was struck as he was being held in the arms of his grandmother inside the garage, near or under the middle bay door.

## Discussion

### Assignments Of Error 1, 2, 3 and 4

"1. The trial court erred by not directing a verdict on the issue of emergency by reason of the fact that all of the evidence conclusively demonstrated that the defendant was confronted with an emergency situation as a matter of law.

"2. The trial court erred by not directing a verdict on the issue of liability by reason of the fact that all of the evidence conclusively demonstrated that the defendant was not guilty of negligence in the emergency situation that confronted him.

"3. The trial court erred by not completely instructing the jury on the law of emergency.

"4. The trial court erred either by charging on ordinary care or by not relating the charge on ordinary care to an emergency situation."

Defendant here, and throughout his brief, combines several assignments of error so we will discuss them in the same fashion.

Benko moved for a directed finding that an emergency situation was present when he fired at the robber(s). This motion was made at the close of plaintiffs' case and renewed after defendant rested. After the charge, defendant moved for a directed "verdict" as to an emergency situation and objected to the charge on ordinary care since it, "wasn't used with respect to the emergency situation."

A "sudden emergency" is defined in paragraph 6 of the syllabus of *Miller* v. *McAllister* (1959), 169 Ohio St. 487, as: "***a sudden and unexpected occurrence of a transitory nature which demanded immediate action without time for reflection or deliberation and does not comprehend a static condition which lasted over a period of time."

If a "sudden emergency" is established, the person

charged with negligence is held to the degree of care commensurate with that which the ordinarily prudent person would exercise when confronted with the emergency. See, *Pennsylvania Railroad Co.* v. *Snyder* (1896), 55 Ohio St. 342; *Radecki* v. *Lammers* (1968), 15 Ohio St. 2d 101; *Motorists Mutual Ins. Co.* v. *Walker* (1970), 26 Ohio Misc. 169, 173; *United States* v. *Jasper* (C. A. 4, 1955), 222 F. 2d 632, 633; Restatement of Torts 2d, Section 296 (1965).

There are factual issues as to whether a "sudden emergency" existed, and assuming it did, whether defendant exercised the appropriate degree of care. Defendant's testimony at several points indicates that he did reflect on his course of action. We also question whether a trained police officer should not be expected to encounter and handle situations which would be extraordinary for the average person. See, Restatement of Torts 2d, Section 296, Comment C. But see *Dyson* v. *Schmidt* (1961), 260 Minn. 129, 109 N.W. 2d 262.

The trial court charged the jury on sudden emergency as follows: If it found the existence of an emergency, then the defendant would be held to the standard of care of a reasonably prudent person under those same facts and circumstances, rather than one facing normal facts and circumstances. The charge placed the burden of proving the emergency upon the police officer. The charge was correct and the facts were such that reasonable minds could differ as to whether an emergency existed. Benko was not entitled to a "directed finding" or verdict as a matter of law. Thus, we hold that the existence of a "sudden emergency" would only alter the test by which reasonable care is measured.

### Assignments Of Error 5 and 6

"The trial court erred by not permitting the defendant to amend his answer to include self defense.

"The trial court erred by not instructing the jury on the law of self defense."

At the end of trial, Benko moved to amend the pleadings to include self-defense and requested that the jury be so instructed. A proposed instruction was apparently submitted, but it is not part of the record. We question whether self-defense is properly termed a "defense" in this case. Benko's "defense" was essentially that he was performing a lawful

act whether it be deemed an act in defense of himself or others, or whether he was discharging his duty in attempting to apprehend a fleeing felon, or he was acting in a sudden emergency. The plaintiffs allege that Benko failed to exercise the requisite degree of care in performing that duty or acting in that emergency. This lack of care is denied by Benko. We hold, on the state of the evidence, that the issue of self-defense was not before the court and did not warrant an explanatory charge on self-defense. It is clear from Benko's own testimony that he hit the ground when the robber's gun was pointed at him as their automobile sped around his roadblock. The threat of harm to Benko or others, from the robbers, was no longer imminent when he jumped up and fired at the speeding-away felons. Benko never saw a gun pointed at him, or others, after he jumped up. We believe that the charge may have been clearer if the court had prefaced the negligence portion of the charge with a general charge on the rights and duties of a policeman when apprehending lawbreakers. However, such omission was not error, nor was such a suggestion offered by counsel.

### Assignment Of Error 7

"The trial court abused his discretion by not separating the liability issue from the damage issue."

Defendant says the trial court prejudicially erred in failing to order separate trials pursuant to Civ. R. 42(B) on the issues of liability and damages. Separate trials were necessary, defendant claims, because of the seriousness of Jonathan's injuries. Benko argues, in effect, that passion and prejudice aroused by the doctor's testimony, as well as the demonstrative evidence of exhibiting Jonathan, influenced the jury's decision on liability. We concur in the defendant's observation that Jonathan sustained horrible injuries. We also note that the case involves very real issues of fact pertaining to the question of liability. However, bifurcated trials are within the discretion of the trial judge. We have no way of determining whether the doctor's testimony describing the injuries and the demonstrative evidence involving the boy influenced the jury's decision on liability. We find no abuse of discretion.

### Assignments Of Error 8, 9, and 10

"The trial court erred by permitting the jury to view the minor plaintiff.

"The trial court erred by not sustaining defendant's motion for a mistrial after the court had observed the minor plaintiff.

"The trial court erred by not inquiring of the jury as to whether or not the jury could be impartial after observing the minor plaintiff."

The infant, Jonathan Heidbreder, remained outside of the courtroom during the entire trial except for the period of demonstration. He was brought before the jury to demonstrate the extent of his motor paralysis and ability to communicate and to do simple tasks. This evidence was relevant to the issue of damages and peripherally so to the liability issue. Prior to this demonstration, an in-camera hearing was held and the proposed demonstration enacted for the trial court. The trial court specifically found that the evidentiary value of the appearance would not be outweighed by its prejudicial effect. We find no error in permitting the jury to see the demonstration and view the infant. The trial court correctly overruled the motion for mistrial. There was no duty on the trial court to conduct a special hearing on the issue of passion and prejudice. Such issue was adequately covered in the general charge.

### Assignments Of Error 11 and 12

"The trial court erred in not directing a verdict for the defendant for the reason that plaintiff's expert failed to relate his testimony to the day of the shooting.

"The trial court erred by failing to strike the testimony of the plaintiff's expert."

After voir dire to determine the qualifications of Bruce Metz, a local attorney, as an expert witness, the trial court sustained defendant's motions to prohibit Metz from testifying to the rules and regulations of any police department, including Northampton Township. This discussion was generally based upon the standard of care under which defendant would be judged. The discussion ended when the trial court stated that the standard of care was distinct from any formal rules and

regulations and were irrelevant to the issue. At the conclusion of plaintiffs' case, defendant moved for a directed verdict on the basis that expert testimony was necessary to establish the pertinent standard of care and that Metz's testimony was insufficient to establish the standard of care as it existed on the day of the shooting. The trial court overruled the motion, apparently (defendant intertwined this motion with his arguments on sudden emergency and the record is not clear as to the precise basis for all of the arguments and rulings made) on the basis that the timeliness of Metz's testimony went to the weight of the evidence. After the jury was instructed, defendant renewed the motion for a directed verdict on the grounds that Metz never related the standard of care to the day of the shooting. Defendant also apparently moved in the alternative to have Metz's testimony stricken. Defendant argues that if expert testimony was necessary to establish the standard of care, then the trial court erred since Metz's testimony was unrelated to the pertinent date. Metz was asked what the "standard of conduct" was for police officers "in this community" concerning the discharge of firearms at fleeing automobiles containing felons. He replied:

"With respect to the serious felonies, again, the officer is to fire his weapon only when his life or that of others is clearly in danger, if the car contains these fleeing felons that have committed serious felonies, and you understand that to be murder, aggravated arson as set out in the Code, he is not to fire then except if he is reasonably certain by so firing there will be no one else jeopardized by that stray, or ricocheting, or misplaced shot. That is essentially the standard."

The answer to defendant's contentions is that Metz was actually rendering his opinion on customary practice, which is only evidence of the standard of conduct. The standard of conduct is fixed by reasonable prudence. See, *U. S. F. & G. Co.* v. *Samuels* (1927), 116 Ohio St. 586; *Campbell* v. *Hughes Provision Co.* (1949), 87 Ohio App. 151; 2 Wigmore on Evidence 592, Section 461 (Chad. rev. 1979). This is exactly how the trial court instructed the jury. We quote portions of the charge:

"Now, since the activity of the Defendant involves a matter not within common knowledge, evidence was introduced as to what others customarily do under such circumstances.

Evidence of customary methods or conduct of others similarly situated does not furnish a test of negligence, nor does it establish a standard by which negligence may be measured.

"You may consider the degree to which such methods have been generally accepted and customarily used, and if the Defendant had knowledge of it.

"If there is a generally accepted custom or usage, which the Defendant knew or should have known, you may consider this along with all the other facts and circumstances in the case in determining whether ordinary care was used by the Defendant at the time in question.

"* * *

"The ultimate question is whether ordinary care was exercised, and this is fixed by a standard of reasonable prudence.

"In other words, you must determine what ought to be done, and this is not necessarily established by either what is customarily done or what is permitted under the Northampton rules. Either or both may be considered by you, however, in your determination of the question of whether the Defendant exercised ordinary care."

The plaintiffs' case did not depend entirely upon Metz's testimony. The failure to relate Metz's testimony concerning custom to the day of the shooting was a matter of weight. *Cf. Johnson* v. *Knipp* (1973), 36 Ohio App. 2d 218.

### Assignment Of Error 13

"The trial court erred by permitting the economist to testify and that error was not cured when the trial court excluded said testimony from the jury's consideration."

After voir dire, defendant moved that plaintiffs' economist, Dr. John F. Burke, be prohibited from testifying to either the expected loss of future income of Jonathan Heidbreder or the expected cost of custodial care for Jonathan. The trial court sustained the first branch of this motion and overruled the latter branch. At the close of plaintiffs' case, and after one witness had followed Dr. Burke's testimony, defendant moved that Dr. Burke's entire testimony be stricken and the jury instructed to disregard his testimony. After defendant had rested, the trial court sustained this motion and in the charge told the jury that the evidence did not

include Dr. Burke's testimony and that his testimony was not to be considered for any purpose.

We believe the trial court's exclusion and admonishment in the general charge as to Dr. Burke's testimony was sufficient to cure the error, if any, in failing to grant the defendant's motion to exclude Burke's testimony after the in-camera hearing. We do not believe the jury was irretrievably poisoned. The size of the verdict belies the fact that they considered his testimony.

## *Summary*

We overrule all thirteen assignments of error and affirm the judgment. Having attained this determination, we do not reach plaintiffs' cross-appeal.

*Judgment affirmed.*

BELL and VICTOR, JJ., concur.