# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 09-2493/10-2290

_____

Elliot Kaplan; Jeanne Kaplan,          *

                                         *

      Appellants,                *

                                         *

        v.                   *   Appeals from the United States

                                       *   District Court for the

Mayo Clinic; Mayo Foundation;     *   District of Minnesota.

Mayo Foundation for Medical        *

Education and Research; Mayo       *

Rochester, Inc.; Mayo Clinic         *

Rochester, Inc.; Lawrence J. Burgart;  *

David Nagorney,                *

                                       *

      Appellees.               *

_____

Submitted:  March 16, 2011
Filed: September 2, 2011

_____

Before SMITH, ARNOLD, and SHEPHERD, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Elliot and Jeanne Kaplan, husband and wife, filed suit against Mayo Clinic Rochester, Inc., other Mayo entities (referred to collectively as Mayo), and Mayo doctors David Nagorney and Lawrence Burgart, making a number of claims arising out of Mr. Kaplan's erroneous diagnosis of pancreatic cancer and his surgery based on that diagnosis. The district court granted summary judgment in favor of Dr. Nagorney, and the case proceeded to trial against the other defendants on claims

of breach of contract and negligent failure to diagnose. At the close of the Kaplans' case-in-chief, the district court granted judgment as a matter of law (JAML) against them on their breach-of-contract claim. The jury then returned a verdict for Mayo and Dr. Burgart on the plaintiffs' claim for negligent failure to diagnose, and the district court entered judgment on that verdict.

The Kaplans appeal the judgments in favor of Mayo and Dr. Burgart on their negligent-failure-to-diagnose and contract claims. We affirm the judgment on the claim for negligent failure to diagnose and the judgment in favor of Dr. Burgart on the contract claim, but we vacate the judgment in favor of Mayo on the contract claim and remand for further proceedings.

I.

After Mr. Kaplan complained of severe abdominal pain, he was taken from his home to a nearby hospital in a suburb of Kansas City, Missouri. Dr. John Dunlap, his long-time family physician, ordered a CT scan, which showed that Mr. Kaplan's pancreas was enlarged and that a "mass could not be excluded." (The pancreas is a large organ behind the stomach and close to the beginning of the small intestine.) Based on a needle biopsy that the hospital performed at Dr. Dunlap's request, a pathologist at the hospital prepared a report stating, "Ductal carcinoma is favored as being the changes noted in the ducts. There was agreement with two other members of the department." Dr. Dunlap told the Kaplans about the report and referred Mr. Kaplan to Mayo and, specifically, to Dr. Nagorney, a Mayo surgeon. Dr. Dunlap also wrote to Dr. Nagorney, asking him to "evaluate" Mr. Kaplan for "probable ductal carcinoma of the head of the pancreas and for consideration of resective surgery." When Mr. Kaplan called to ask Dr. Nagorney to treat him, he told the doctor that he had "concerns" about the cancer diagnosis and that his father, who was the chief of cardiology at a Los Angeles hospital, had described the diagnosis as "pretty weak."

Dr. Nagorney agreed to treat Mr. Kaplan and asked him for the hospital records and the biopsy slides that the pathologists had examined. After the hospital removed tissue by inserting a needle into Mr. Kaplan's pancreas, the tissue was embedded in parrafin wax that was formed into a block; the hospital then used thin slices of the block to make the slides that the pathologist examined. After the slides arrived at Mayo, Dr. Burgart reviewed them and provided a written "diagnosis": "Pancreas, head, needle biopsy. Infiltrating grade 2 (of four) adenocarcinoma." In accordance with Dr. Burgart's custom, he had another Mayo pathologist, Dr. Thomas Smyrk, review the slides without knowing Dr. Burgart's diagnosis; Dr. Smyrk also diagnosed pancreatic cancer.

Dr. Nagorney reviewed Dr. Burgart's report before the Kaplans arrived at Mayo. When the Kaplans came to his office, Dr. Nagorney immediately told them that Mr. Kaplan had pancreatic cancer, that it was deadly and aggressive, and that he (Dr. Nagorney) could do surgery the next morning. He recommended the so-called "Whipple procedure," which entails removing part of the pancreas and stomach, as well as the duodenum; he performed the procedure on Mr. Kaplan three days later. But after Dr. Burgart and other Mayo pathologists examined the excised pancreatic tissue, they concluded that Mr. Kaplan had never had cancer at all. The pathology report stated that the tissue had features of pancreatitis. The Kaplans first brought suit in Missouri state court against the Kansas City medical care providers, as well as the defendants in this case. After the state court dismissed the Mayo defendants for lack of personal jurisdiction, the Kaplans brought the present action.

At trial, the parties presented conflicting expert testimony as to whether the biopsy slides that Dr. Burgart relied on supported his diagnosis of pancreatic cancer. The Kaplans also presented evidence that the Whipple procedure caused Mr. Kaplan pain that prevented him from working regularly or engaging in activities that he had previously enjoyed. Dr. Dunlap, who continued to treat Mr. Kaplan, testified to the ongoing difficulty managing Mr. Kaplan's pain. During direct testimony, the doctor

-3-

attributed the pain to a condition that sometimes occurs after the Whipple procedure and causes food to be trapped in the intestinal tract. On cross-examination, the defendants' counsel referred to documents in Dr. Dunlap's medical file for Mr. Kaplan in which the doctor had diagnosed Mr. Kaplan with pancreatitis and identified pancreatitis as the cause of his pain; and Dr. Dunlap agreed that the Whipple procedure did not cause pancreatitis. Dr. Dunlap testified that he based his diagnosis of pancreatitis on Mayo's post-surgery pathology report stating that the excised pancreatic tissue had features of pancreatitis; but he attributed Mr. Kaplan's chronic (or "background") pain to pancreatitis and stated that Mr. Kaplan had intermittent bouts of severe pain during which he was unable to function that were likely caused by the Whipple procedure. Dr. Dunlap explained that he had not included the Whipple-related diagnosis in his medical reports because he "could not prove it."

The parties also offered conflicting evidence as to whether Dr. Nagorney promised the plaintiffs that he would do an intraoperative biopsy to determine whether Mr. Kaplan had cancer and abandon the procedure if the biopsy showed that he did not.

## II.

The Kaplans assert that they are entitled to a new trial on their claim for negligent failure to diagnose for several reasons. We address each of those reasons in turn.

**1.** The Kaplans first contend that the district court committed reversible error by admitting Dr. Dunlap's entire medical file on Mr. Kaplan into evidence. They assert that the file included 54 documents that referred to insurance and were therefore inadmissible under Minn. Stat. § 548.251, which prohibits informing the jury "of the existence of collateral source or any future benefits which may or may not be payable to the plaintiffs." The court admitted the exhibit; it agreed with the defendants' interpretation of the statute and expressed doubt that they would use all 54 documents.

Dr. Dunlap mentioned insurance only twice during his trial testimony, both times during direct examination. The first time, after the Kaplans' attorney handed him a binder and asked him to look for a particular exhibit in it, the doctor asked whether he should look in a section titled "Insurance Information." Later, the Kaplans' attorney asked Dr. Dunlap whether he had had "occasion to write to various people and tell them" that Mr. Kaplan had pancreatitis. In response, Dr. Dunlap testified that a Mayo pathologist had reported that the pancreatic tissue removed during Mr. Kaplan's surgery had "elements of chronic pancreatitis. And when I have reported to his insurance company, we've included that diagnosis."

During cross-examination, neither Dr. Dunlap nor the defendants' attorney spoke of insurance or other potential third-party payors. Counsel asked Dr. Dunlap about his statements diagnosing Mr. Kaplan with pancreatitis and attributing his post-surgery symptoms to that condition rather than to the surgery. Some of these entries appeared in Dr. Dunlap's office notes, in hospital records, and in correspondence with other doctors. Although the defendants' attorney asked Dr. Dunlap about an entry that appeared on an insurance form, counsel questioned him only about his having written "pancreatitis" as Mr. Kaplan's diagnosis and did not mention insurance.

With so little mention of insurance during the trial and no mention by the defendants, we conclude that the error, if any, in admitting the documents into evidence, did not affect the Kaplans' substantial rights. Fed. R. Civ. P. 61; *Williams v. Kansas City, Mo.*, 223 F.3d 749, 755 (8th Cir. 2000). Nor can the court's refusal to give a limiting instruction be the basis for reversal. The court stated that it would not give the instruction because it was likely to draw attention to insurance. We question whether a court should refuse an instruction because it concludes that it may prejudice the party requesting it. But we understand why the court may have believed that the instruction would unduly highlight insurance where nothing during the trial would have drawn the jury's attention to potential collateral sources. In any event, we

conclude that the Kaplans were not prejudiced by the court's decision not to give the instruction.

2.     The Kaplans also maintain that the district court erred in admitting certain photographs that the defendants' witnesses testified they had taken of the biopsy slides from which Dr. Burgart diagnosed cancer. When the defendants sought to use the photographs during direct examination of Dr. Burgart, the Kaplans objected based on lack of foundation. They first argued that the court should, at a minimum, exclude the photos that Dr. Burgart had not taken, since the defendants' expert, Dr. Joel Greenson, who had taken some of the photos, had not yet testified. The court denied the objection, allowing the defendants to use the photos based on counsel's representation that Dr. Greenson would later identify them.

The Kaplans then argued that the defendants could not authenticate the photos because they had broken the "chain of custody" for the slides that the photos purportedly depicted. In particular, they asserted that the defendants had once given the slides to the Kaplans' "adversaries" in the Missouri action, who had "every incentive to ensure that the tissue on these slides by the time it came back looked cancerous." The court doubted the need for a chain of custody and said that counsel's assertions about their Missouri adversaries was "speculation"; the court ruled that unless it found something "amiss in the slides," it would permit the defendants to lay as much foundation as they could with Dr. Burgart and "tie it up" with other witnesses. After the court concluded, "If there is a problem, we will instruct the jury accordingly," the defendants' attorney said that the defendants would "provide an affidavit from Missouri counsel that there was nothing done to these." The jury then returned to the courtroom and Dr. Burgart resumed his testimony. The defendants later presented the testimony of Dr. Greenson, who identified his photographs and provided the date that they were taken, a date before the defendants purportedly transferred the slides to the Kaplans' Missouri adversaries. Dr. Smyrk, moreover, compared the photographs taken by the Kaplans' expert, Dr. Barry Shmookler, and

those taken by Dr. Greenson and Dr. Burgart, and testified that they were taken of "essentially the same area" of pancreatic tissue and were of the same original biopsy slides.

On appeal, the Kaplans maintain that the defendants failed to authenticate the photos. They rely primarily on the contention that the defendants did not provide a chain of custody for the slides and should have kept their "promise" to provide a chain of custody from the Missouri defendants. We review the question of whether the district court erred by admitting improperly authenticated evidence for an abuse of discretion and disregard any error that does not affect a party's substantial rights. *See Jones v. National Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010). To authenticate an exhibit, a party "need only prove a rational basis for that party's claim that the document is what it is asserted to be," which may "be done with circumstantial evidence." *Id.* (internal quotation marks and citation omitted); *see* Fed. R. Evid. 901(a). Once the threshold requirement is met, and it clearly is here, any question as to whether the evidence is authentic is for the jury. *Banghart v. Origoverken, A.B.*, 49 F.3d 1302, 1304-05 (8th Cir. 1995); *see Jones*, 608 F.3d at 1045.

We agree with the district court that the Kaplans' assertion that the slides might have been tampered with was based on rank speculation. They failed to present evidence that the slides had been changed in any way, and Dr. Smyrk testified that it would be physically impossible to alter the slides in the manner that the Kaplans suggested. There is no error here.

**3.** The Kaplans assert next that the district court plainly erred by omitting Dr. Burgart's name from a jury instruction. We generally review jury instructions for an abuse of discretion and reverse only if, as a whole, they did not fairly and adequately submit the issues in the case to the jury. *PFS Dist. Co. v. Raduechel*, 574 F.3d 580, 594 (8th Cir. 2009). But since the Kaplans did not raise their objection

at trial, to succeed on it here they must establish plain error, a particularly stringent requirement. *See Csiszer*, 614 F.3d at 871.

The Kaplans challenge Instruction 13 because it did not mention Dr. Burgart by name. That instruction notified the jury that to prove their medical negligence claim the plaintiffs had to show by a preponderance of the evidence "that Mayo Clinic Rochester doctors" deviated from the standard of care. Although Dr. Burgart's name is absent, the undisputed evidence at trial left no doubt that he was a "Mayo Clinic Rochester doctor." In the immediately preceding instruction, jurors were told that Mayo, as a corporation, could act only through its doctors, nurses, and other employees. And Instruction 15 referred to Dr. Burgart by name, telling the jury that the fact that the Kaplans claimed that an injury occurred did not alone mean that Mayo "and/or Lawrence Burgart were negligent." We see no basis for the Kaplans' contention that the jurors, having received these instructions and heard the evidence, would have been confused when asked in a special verdict form whether "Mayo Clinic Rochester and/or Lawrence Burgart were negligent in the care and treatment of Elliot Kaplan as submitted in Instruction 13?" And the Kaplans certainly have not established that the error, if any, in omitting Dr. Burgart's name from the instruction, "seriously affected the integrity, fairness, or public reputation of judicial proceedings," a prerequisite for plain error relief, *Rahn v. Hawkins*, 464 F.3d 813, 819 (8th Cir. 2006). This is an entirely meritless objection, and we reject it.

We conclude that the Kaplans have shown no basis for granting them a new trial on their claim for negligent failure to diagnose.

### III.

The Kaplans also maintain that the district court erred in granting JAML to Mayo and Dr. Burgart on their contract claim. We review the grant of JAML *de novo* and will affirm only if "no reasonable jury" could have found in favor of the

nonmoving party. *Mattis v. Carlon Elec. Prods.*, 295 F.3d 856, 860 (8th Cir. 2002); *see* Fed. R. Civ. P. 50(a).

To make out a claim for breach of contract, the plaintiffs had to show the formation of the contract, the defendants' breach, and resulting damages. *See Briggs Transp. Co. v. Ranzenberger*, 299 Minn. 127, 129, 217 N.W.2d 198, 200 (1974); *Costello v. Johnson*, 265 Minn. 204, 208, 121 N.W.2d 70, 74 (1963). The district court concluded that the Kaplans' claim merely restated a medical negligence claim as a breach of contract, and held that the Kaplans therefore required expert testimony to show that Dr. Nagorney failed to meet the appropriate standard of care by not performing an intraoperative biopsy and that this failure caused Mr. Kaplan to undergo the Whipple surgery. *See* Minn. Stat. § 145.682. We disagree.

In their amended complaint, the Kaplans alleged that after Mr. Kaplan told Dr. Nagorney that he was concerned about the accuracy of the cancer diagnosis, Dr. Nagorney, individually and on behalf of Mayo, made a "definitive agreement" with Mr. Kaplan that Dr. Nagorney and his Mayo colleagues "would insure that Mayo's pathology diagnosis would be exhaustive and precise," and that, as consideration, Mr. Kaplan authorized Dr. Nagorney and his colleagues to perform the Whipple procedure and paid them for that surgery. The plaintiffs further alleged that Dr. Nagorney breached the agreement by failing to tell his colleagues about Mr. Kaplan's concerns, failing to "insist that Mayo perform its own biopsy, or create it's [sic] own slides" from the tissue removed during the needle biopsy, and failing to "take any of the other steps that Mr. Kaplan was told that Dr. Nagorney and Mayo would take to insure that the diagnosis of his condition was correct."

As is apparent, the plaintiffs did not allege that Dr. Burgart entered into an agreement with them, nor did they present any evidence to that effect at trial. They relied instead on their interactions with Dr. Nagorney. We therefore conclude that the district court properly granted JAML to Dr. Burgart on the contract claim. Mayo,

however, does not contend that any promise that Dr. Nagorney made was not on its behalf, or that it is not bound if it was, so we review the evidence to determine whether it will support a contract claim against Mayo.

We view the evidence in a light favorable to the Kaplans, as the context requires. When the Kaplans arrived at Mayo, Dr. Nagorney immediately told them that Mr. Kaplan had cancer. Mr. Kaplan responded by asking the doctor whether he was sure of the diagnosis. Dr. Nagorney said that he had no doubt that Mr. Kaplan had cancer because a Mayo pathologist, who was one of the best in the world, if not the best, had unequivocally diagnosed him with it. After Dr. Nagorney explained the Whipple procedure to the Kaplans, Mr. Kaplan asked him if they could verify that he had cancer after they opened him up for surgery. Dr. Nagorney said that they would do a biopsy of the "mass ... to verify that it's cancer," and that "if they didn't find cancer, they'd just close [Mr. Kaplan] up and send [him] home." Dr. Nagorney outlined three possibilities to the Kaplans: In the third one, if the biopsy they performed showed no cancer, they would close him up. But Dr. Nagorney did not perform an intraoperative biopsy of Mr. Kaplan's pancreatic tissue to verify that he had cancer.

It is true that Dr. Nagorney testified that he had not promised to do such a biopsy. He testified that, "unfortunately," there was no intraoperative (or pre-operative) procedure that could have confirmed Dr. Burgart's cancer diagnosis and that the only way to find out that Mr. Kaplan did not actually have cancer was to "proceed with the operation" (apparently the Whipple procedure). But this testimony merely raises factual questions for the jury as to whether there was an agreement. Dr. Nagorney acknowledged, moreover, that he had performed intraoperative biopsies of the pancreas in the past to determine whether to proceed with a Whipple surgery and that other surgeons still followed that protocol. This evidence lends some credibility to the testimony that Dr. Nagorney promised to do the procedure in this

case (perhaps to ease Mr. Kaplan's ongoing concerns about the accuracy of the diagnosis).

Dr. Nagorney's testimony also shows that it was commonplace for him to perform intraoperative biopsies during pancreatic cancer surgery. When he saw something "suspicious," he would send a piece of the tissue to the pathologist, who would report the result over a loudspeaker within ten minutes. In Mr. Kaplan's case, Dr. Nagorney had three pieces of tissue checked for cancer before doing the Whipple procedure. If the pathologist had found that cancer had spread to any of these areas, Dr. Nagorney said he would have stopped the operation. As he always did before closing, Dr. Nagorney had the pathologist examine the tissue removed during Mr. Kaplan's Whipple procedure for so-called "clean margins," *i.e.*, healthy tissue surrounding the excised cancer. Clean margins indicate that the surgeon has removed all the cancer, and, if the margins were not clean, Dr. Nagorney would remove additional tissue. Though he did not perform the promised biopsy, he repeatedly had the pathologist check for cancer during Mr. Kaplan's surgery.

The testimony of the Kaplans and Dr. Nagorney was quite evidently more than sufficient to support a finding of the formation of a contract, and the breach is undisputed. To prove damages, the plaintiffs would first have had to offer evidence to support a finding that the intraoperative biopsy results would have been negative for cancer. We think that they did that: It's undisputed that Mr. Kaplan did not have cancer, and the defendants presented evidence that, although a biopsy sometimes appears to show cancer where there is none, that occurs rarely. In addition, the intraoperative biopsy of pancreatic tissue removed during the Whipple showed no cancer. We therefore believe that a jury could reasonably find that, had Dr. Nagorney done the promised procedure, it would have shown that Mr. Kaplan did not have cancer.

-11-

The Kaplans also had to establish that Dr. Nagorney would not have performed the Whipple procedure if the promised biopsy was negative, and Mayo argues that the jury could not have made such a finding because Dr. Nagorney testified that he had to do the Whipple procedure once Dr. Burgart diagnosed cancer. We disagree. As we have already noted, Dr. Nagorney testified that he had used the intraoperative biopsy in the past to decide whether to do a Whipple procedure and that, though he had stopped, others still did so. The plaintiffs both testified that Dr. Nagorney told them that he would not proceed with the Whipple procedure if he could not verify the cancer diagnosis through an intraoperative biopsy. And we think that a jury could also believe that Dr. Nagorney would be more hesitant in Mr. Kaplan's case to proceed with the Whipple after a negative intraoperative biopsy because Mr. Kaplan repeatedly questioned the cancer diagnosis. Drawing all inferences in favor of the plaintiffs, as we must in the current context, we believe that the evidence would support a finding that Dr. Nagorney would not have done the Whipple procedure in the face of an intraoperative biopsy that showed no cancer. Dr. Nagorney admitted at trial that Mr. Kaplan did not need the Whipple procedure, and we believe that the plaintiffs provided sufficient evidence of economic damages resulting from that procedure – though the amount was greatly disputed – to meet the final requirement for making out their contract claim.

It is true that Minnesota law requires plaintiffs to file an expert-witness affidavit in any action against a health care provider for "malpractice, error, mistake, or failure to cure, whether based on contract or tort," if "expert testimony is necessary to establish a prima facie case" in that action. Minn. Stat. § 145.682. But the statute says nothing about what kinds of cases require expert testimony. That is left to the general law of Minnesota. Under that law, expert testimony is not necessary to establish matters that lie within the general knowledge of lay people. *See Tousignant v. St. Louis County*, 615 N.W.2d 53, 58 (Minn. 2000); *Dyson v. Schmidt*, 260 Minn. 129, 140, 109 N.W.2d 262, 269 (1961). No such testimony is necessary in this perfectly ordinary, garden-variety contract claim. The claim is straightforward and

does not depend, for instance, on a showing that the defendants violated a standard of care that Minnesota doctors are required to adhere to. Here, the plaintiffs' claim is simply that a physician promised to perform a certain procedure and did not do it, resulting in damages to them. The plaintiffs therefore offered sufficient evidence in their case-in-chief to support a breach-of-contract claim against Mayo without offering the testimony of an expert.

## VI.

We reverse the grant of JAML to Mayo on the Kaplans' claim for breach of contract and remand for further proceedings. We affirm the judgment in favor of Dr. Burgart on the contract claim and the judgment for Mayo and Dr. Burgart on the Kaplans' claim for negligent failure to diagnose.[1]

———————————————————

[1]The parties' briefs do not discuss the question of whether Ms. Kaplan's loss-of-consortium damages are recoverable in a contract action. This is a matter for exploration on remand should it arise.